[Crim. No. 1118. Fourth Dist. Oct. 30, 1956.]

THE PEOPLE, Respondent, v. JOHN D. WOODARD et al., Defendants; STEWART METZ, Appellant.

James L. King and Harold King for Appellant.

Edmund G. Brown, Attorney General, and James L. Mamakos, Deputy Attorney General, for Respondent.

GRIFFIN, J.—Defendants Stewart Metz, John D. Woodard, Steve Mikolasik and Carl St. Claire were indicted by the grand jury on June 22, 1955. In Counts I and II it was charged that Woodard and Mikolasik committed perjury, in violation of section 118 of the Penal Code. Count III charged Metz and St. Claire with subornation of perjury, in violation

of section 127 of the Penal Code. In Count IV they were charged with bribery (Pen. Code, § 137). And in Count V Metz, St. Claire, Mikolasik and Woodard were charged with the crime of conspiracy to commit subornation of perjury (Pen. Code, § 182) in that between October 14, 1954 and January 25, 1955, they feloniously conspired to procure certain persons to be called as witnesses in a criminal action in the municipal court against defendant Mikolasik, wherein the People were prosecuting said defendant for the crime of violating section I of a City Ordinance Number 536, of the city of San Bernardino, a misdemeanor, and of having administered an oath to them to testify falsely in said criminal action.

Four overt acts are alleged: (1) That defendant Woodard, at the request of defendant St. Claire, on January 17, 1955, transported, in his car, one Walter L. Dunn from the office of St. Claire to the office of the attorney for the defendant Mikolasik; (2) that defendant Metz, on January 19, 1955, did the same thing; (3) that defendant Metz, on January 22, 1955, paid money to Dunn; and (4) that St. Claire, on January 23, 1955, directed his employee, Dunn, to testify that he, Dunn, was, on October 14, 1954, a trusty in the city jail, and to falsely testify that he visited the Brass Rail Café on October 14, 1954.

Defendants Metz and St. Claire went to trial only upon the fifth count and were allowed a separate trial from the other named defendants. It resulted in a conviction of both by a jury on that count, as charged. Motions for new trial were denied. They were sentenced to State's prison, execution of sentence was suspended, and probation was granted for two years on certain specified conditions, including the payment of a $1,000 fine. Defendant Metz alone appealed from the judgment and order denying a new trial.

The evidence shows that defendant Metz was a member of a firm which had been engaged in the business of owning and placing amusement-type and pinball machines in various business establishments. On October 14, 1954, this firm had a pinball machine located in the Brass Rail Café on West Third Street in San Bernardino. It had been there for about three months and was being operated under a license issued by the city. The net proceeds from its operations were divided equally between the said firm and the proprietor of the place. On that day two men, who were officers of the Riverside Police Department, entered the Brass Rail Café

and played the pinball machine. Defendant Mikolasik was employed in the café at the time. The officers testified that they had put $4.00 into the pinball machine and had been paid off by Mikolasik in the sum of $4.00. They also testified there were no other persons present at the time except the parties indicated. Mikolasik was arrested upon a charge of violating a city ordinance prohibiting gambling, and the machine was impounded. On January 20, 1955, the case against Mikolasik came to trial in the municipal court and Attorney Krumm represented him.

Three witnesses testified for the defense in the municipal court, the said Mikolasik, John Woodard and Walter Dunn. They each testified that they were present in the Brass Rail Café when the two officers were in there on October 14, and that the $4.00 paid to the officers was a refund of the $4.00 put into the machine by them, and not a payoff on the machine; that the officers made some complaint about the machine and Mikolasik refunded their money (which they put into the machine) rather than have any trouble with them.

It appears that upon cross-examination of the witness Dunn it was established that he was confined in the city jail of San Bernardino on October 14. The case was continued until five days later when Dunn again took the witness stand and testified that he had been a trusty in the city jail on October 14, and as such trusty was working outside of the jail in a garden around the hall of justice on which the jail was located; that he had changed his clothes, left his work, gone to the Brass Rail Café, and was present at the time the two officers were there. Thereafter Dunn was charged with the crime of perjury and ultimately entered a plea of guilty thereto in the superior court. As a result of this, defendants Metz and St. Claire were charged in Count V of this indictment with the crime of conspiracy to procure Dunn as a witness in the municipal court trial, and to therein testify falsely.

The testimony at the trial of this action may be thus summarized: Dunn said he had been a used-car salesman for St. Claire and Cramp Motor Unit and Service Station, of which defendant St. Claire was part owner; that this place of business was near the Brass Rail Café, of which defendant Mikolasik was one of the proprietors, and which was located in the west end of the city, nearly a mile from the city jail; that Mikolasik and St. Claire were quite close personal friends; that defendant Metz had a company account with St. Claire and obtained much of his gasoline at this station; and that

one of St. Claire's pinball machines was located in that place of business. Defendant Woodard had been an employee of St. Claire and knew him pretty well.

One of the office employees of St. Claire, Lambith, testified that St. Claire had a desk near him; that a few days prior to the municipal court trial of Mikolasik, he answered the telephone and the voice stated it was Mr. Metz, which he recognized, and he asked for Carl (St. Claire); that he heard Carl say over the telephone something about the pending municipal court case and about witnesses, and heard him say: "If you want to buy witnesses you can get them for a dime a dozen"; that Carl told Metz he was going to appear as a witness and he would take care of it, and that he could get anything if he wanted to pay for it; that Carl hung up the telephone and said to Lambith that he did not think he should stick his neck out by testifying to anything that was not so. The conversation between Carl and the witness was admitted only as to defendant St. Claire. He further testified that several such conversations over the telephone were noted and on one occasion St. Claire assured Metz that he (Carl) would be a witness at the trial, and told the other party on the telephone not to worry because he would take care of it; that subsequently St. Claire told Lambith he (St. Claire) was going to be a witness at the trial but changed his mind and was not going to testify to something that was not so; that Walter Dunn needed the money and did not have anything to lose and he would have him go in his place; that he saw Metz in and around Carl's premises several times during the month of January, 1955; that on Wednesday, the day before the trial, he saw Metz there talking to Carl; that on the evening of January 19th he saw Dunn in the office with Carl and they were discussing the forthcoming trial to be held the next day and he heard him tell Dunn to go home and stay sober so he would be sure to be down there in the morning at 8 o'clock to go to attorney Krumm's office about the trial. Metz gave Dunn a ride to that office that morning but did not go with him to see the attorney. Lambith then testified that after Dunn testified he returned to the service station and St. Claire told him "he (Dunn) was pretty stupid if he could not remember that he was in jail at the time he was supposed to be in the Brass Rail," and Dunn said he did not remember being in jail at that time and St. Claire said he had made a "mess" of it and asked Dunn if he was a trusty at the time and discussed the possibility of leaving the

jail grounds and going to the Brass Rail; that Dunn did not like the idea because he would probably get in deeper than he was if the chief found he left the jail grounds when he was supposed to be there; that Carl assured him there was nothing else he could say and told Dunn to go and so testify; that Carl called someone on the telephone and outlined this proposed testimony of Dunn to that person; that during the next three days there was considerable discussion between Dunn and Carl in reference to this testimony; and that on the morning of the next hearing (January 25th) Dunn and St. Claire had breakfast together.

Dunn then testified that Metz and St. Claire were discussing his proposed testimony while on the lot and St. Claire called him over, introduced him to Metz, and said: "That was the story they were going to use and they wanted me to go down there . . . and do a good job" of it, and if I did "I would get my money; . . . This is the man who will pay you one hundred if you appear as a witness at the Mikolasik case . . ."; that he told St. Claire he did not even know anything about the Brass Rail since he had not been there for several years, and did not know Mikolasik; that St. Claire replied: "You don't need to. You will find out when you get down town"; that Metz drove him to the attorney's office; that the attorney asked him if he was a trusty at that time and he answered in the affirmative and stated that he could verify it by the city gardener; that he was taken to the gardener by this attorney; that the day before the trial he saw St. Claire and Metz on a lot and he stopped Metz and asked: "Well, when do I get some of the money for appearing as a witness in the Mikolasik case" because his room rent was due; that Metz reached in his pocket and handed him a twenty-dollar bill and said "This will hold you over until this other trial"; that he paid his room rent at that time (this fact was corroborated by the hotel clerk); that after the trial he (Dunn) returned to the lot and St. Claire would not speak to him; that Metz came by and he asked him for the rest of his money and Metz said: "Hell, I don't even know you"; that he did not see Metz again, and St. Claire ordered Dunn off of the lot.

The attorney for Mikolasik, in the municipal court, testified he was requested by Metz to represent Mikolasik and was paid by Metz for this service; that Mikolasik came to his office and told him that St. Claire, Woodard and Dunn were in the Brass Rail at the time; that immediately after this conver-

sation Metz came to his office and asked his opinion concerning the outcome of the case and he told him the chances were favorable in view of the testimony of the supporting witnesses who would testify that Mikolasik made no payoff but only refunded the money to the officers; that a conference was later had between him, Dunn, Woodard, St. Claire and Mikolasik in his office and in substance they all said they were there on that occasion; that they went to the municipal court and so testified.

Mikolasik testified that when he was arrested he called Metz and told him about the facts and later he went to see the attorney employed by Metz and was there told that Woodard, St. Claire and Dunn would be witnesses. Mikolasik did testify that Dunn was there at the time. He also stated that after the trial Dunn came to the Brass Rail and demanded $20.

St. Claire testified at the Mikolasik trial that he was at the Brass Rail at the time, saw Dunn and Woodard there, but did not hear the conversation in reference to the claimed payoff. He denied generally the claimed conversations with Metz and Dunn and produced several witnesses from his office who testified that they heard no such conversations. He denied generally the testimony of Dunn and others which would implicate him in the charge. He said Lambith had been discharged by him on several occasions and this accounted for his testimony in the instant case. Metz denied promising anything to Woodard or Dunn for testifying as a witness. He admitted driving Dunn to the attorney's office, denied the conversation regarding him paying Dunn $100 for testifying, admitted Dunn approached him at the lot and said something about doing Metz a favor and that he told Dunn he "didn't do him a favor, he wasn't on trial," that "You went down there and perjured yourself, you better be worried about yourself, not me"; and that Metz drove away. He then said that it was not his practice to hire an attorney for operators of pinball machines for alleged payoffs but this being the first machine confiscated in some time, he felt obligated to provide legal counsel. Defendant Metz produced a considerable number of character witnesses of some prominence in the city, and among them was one who had known defendant Metz for about ten years, both in a professional capacity and on a social basis. He testified he knew his reputation in the community to be good. On cross-examination he testified he had not specifically discussed his reputation with persons in the community for truth, honesty and integrity. Thereupon the

prosecution moved to strike his entire testimony and the court erroneously granted the motion. Since defendant produced several other witnesses who testified as to defendant's claimed good reputation and the people produced no witnesses in opposition, defendant may not now claim prejudicial error as a result of the ruling. (*People* v. *Hoffman,* 199 Cal. 155, 160 [248 P. 504].)

The next point claimed is that the evidence did not establish that there was an agreement or understanding between two or more people to do an unlawful act, and that there was no overt act done by this defendant in furtherance of such agreement. It is claimed that the evidence produced against defendant Metz comes almost entirely from the witness Dunn, an admitted perjurer, and since the extrajudicial statements of one of the alleged conspirators is not sufficient to prove the agreement against the coconspirator, there was no sufficient evidence to establish the claimed unlawful agreement insofar as it affected defendant Metz, citing such authority as *People* v. *Black,* 45 Cal.App.2d 87 [113 P.2d 746]; *People* v. *Doble,* 203 Cal. 510 [265 P. 184]; and *People* v. *Bucchierre,* 57 Cal.App.2d 153 [134 P.2d 505.]

■■ It is well settled that the gist of conspiracy is the unlawful agreement to commit an offense and an overt act done in furtherance of the agreement; that its existence may be established by circumstantial as well as by direct evidence, which may be inferred from the acts or conduct of the defendant in mutually carrying out a common unlawful purpose. ■■ An explicit or formal agreement between the parties is not necessary, and when established, all the members of the conspiracy are bound by all acts of the members done in furtherance of the agreed plot. (*People* v. *Griffin,* 98 Cal. App.2d 1 [219 P.2d 519]; *People* v. *Daener,* 96 Cal.App.2d 827 [216 P.2d 511]; *People* v. *Sica,* 112 Cal.App.2d 574 [247 P.2d 72]; *People* v. *Frankfort,* 114 Cal.App.2d 680 [251 P.2d 401].)

■ We must assume in support of the judgment the existence of every fact which the trier of facts could reasonably have deduced from the evidence, and then determine whether the facts justify the inference of guilt. (*People* v. *Frankfort, supra.*) ■ Applying these principles, it is clear that the jury was amply warranted in drawing the inference that a plan and agreement existed between the defendant Metz and the codefendant St. Claire to suborn

perjury by procuring Dunn to testify falsely. The evidence is sufficient to support the charge.

It is next argued that the trial court erred in refusing to allow the defendant Metz to impeach the testimony of Dunn by his testimony taken before the grand jury. After Dunn testified at this trial that he testified falsely at the municipal court trial, i. e., that he was present at the Brass Rail on October 14th, and was confronted with the record showing he was then confined in the city jail, he was asked on cross-examination if he did not honestly believe he was telling the truth until he was confronted with the jail record. He was then asked if he did not testify before the grand jury that he did not realize that he had not been at the Brass Rail until he was "trapped" by being confronted with the record. The trial court refused to admit his testimony before the grand jury in this respect on the ground it was not proper impeachment. No doubt Dunn knew on each occasion whether he was at the Brass Rail on that occasion and the fact that he was "trapped" would not affect his knowledge of the true facts. The ruling was proper.

At the trial one Haynes testified he had a conversation with his employer, St. Claire, in which he asked St. Claire if it was true that Dunn was going to get $100 for testifying in the Brass Rail trial, and he replied in the affirmative and that the S. & A. Novelty Company, with which defendant Metz was associated, was going to pay him. He was fully cross-examined on this testimony. After the people had presented rebuttal testimony and rested their case, counsel for defendant asked permission to recall the witness for further testimony under the authority of *People* v. *Brady,* 56 Cal.App. 777 [206 P. 668]; and *People* v. *Renwick,* 31 Cal.App. 774 [161 P. 1022]. The court refused and counsel approached the bench beyond the hearing of the jury, and made an offer of proof to the effect that the witness approached counsel for defendant in the hall during a recess at about that stage of the proceedings and said he wanted to resume the stand and correct his testimony in certain respects, saying that "I want to testify I didn't know whether he made any such statement or not." The request might well have been granted. However, from the showing made it indicates that counsel for defendant had some information as to this recanting witness's intended testimony some time before the case was closed. The trial judge concluded that it was improper to allow the witness to again testify as defendant's witness at that stage of the proceedings.

On a motion for new trial the witness's affidavit was offered in support of it. He there stated, contrary to his testimony at the trial and the offer of proof, that he did not have the conversation with St. Claire regarding the payment of $100 to the witness in the Mikolasik case. The trial judge fully considered the motion and affidavit and concluded he did not have much faith or trust respecting the witness and his change of testimony, and denied the motion. Since there was other sufficient competent direct evidence before the jury relating to this particular transaction we perceive no prejudicial error in the ruling.

■■■ It is next claimed that the prosecuting attorney was guilty of prejudicial misconduct in his argument to the jury. The character witnesses of defendant were asked, on cross-examination, if they had ever heard of defendant's previous arrests in Los Angeles and in Berkeley and they answered in the negative. No complaint is made to this questioning but it is claimed that the prosecuting attorney referred to these arrests in his argument to the jury and said that defendant had failed to produce any evidence to the effect that he had not been arrested in those places. Assuming the truth of this statement, misconduct was apparent. (*People* v. *Stennett,* 51 Cal.App. 370 [197 P. 372].) However, the closing argument was not reported due to failure of the recording equipment. It does appear from the reporter's transcript that an objection was made to some portion of the prosecutor's argument and the court admonished the jurors that the questions asked of the various character witnesses were proper but they were not to be concerned with the truth or falsity of the alleged rumors or reports, and they should not consider them as having been proved. Under the circumstances it cannot be held that prejudicial error resulted.

■■■ Lastly, the defendant offered 49 instructions and 18 of them were given. Among those refused as covered were two (No. III and No. IV) touching upon the subject of the indictment being a mere accusation and not evidence of guilt. The claim is that they were not covered by other instructions. We see no merit to this. While not specifically covered, in effect, the jury was sufficiently informed on that subject. Refused instruction Number IX related to the question of proof necessary in a criminal action as compared to that in a civil action. This was sufficiently covered by other instructions, particularly one given in the language of CALJIC 21, on reasonable doubt, presumption of innocence, and burden

of proof. Another refused instruction defined a criminal conspiracy and contained a statement that it was not unlawful for two or more persons to agree to do something that can lawfully be done by one person, and that the jury could not consider acts or declarations of others made outside of the presence of the defendant until, independent of such declarations and acts, a conspiracy had been shown to exist, citing *People* v. *Doble, supra.*

Defendant's given instruction Number XXXIII, in the language of CALJIC 935 reiterates this principle together with the other instructions given on the subject. It was sufficiently covered. No error appears as to given instruction Number XXIII pertaining to the consideration of the testimony of the defendant as compared to other witnesses. This was sufficiently covered by defendant's given instruction Number XIII and other instructions in the language of CALJIC 52 pertaining to the credibility of witnesses generally.

Judgment and order denying a new trial affirmed.

Barnard, P. J., concurred.