[Crim. No. 6687.   Second Dist., Div. Three.   Feb. 25, 1960.]

THE PEOPLE, Respondent, v. WILLIAM PETER VETRI, Appellant.

Morris Lavine and Ernest L. Graves for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Robert M. Sweet, Deputy Attorney General, for Respondent.

VALLÉE, J.—A jury convicted defendants William Peter Vetri and John Rodgers Kiley of conspiring to violate Penal Code, sections 266h (pimping) and 266i (pandering) and section 41.08 of the Los Angeles Municipal Code (prostitution —procuring). Proceedings were suspended and Vetri was granted probation. He appeals from the verdict, the judgment, the order denying his motion for a new trial, and the order granting probation. ▇ An appeal does not lie from the verdict, and that appeal will be dismissed. ▇ We construe the appeal from the judgment as an appeal from the order granting probation. The order granting probation is deemed to be a final judgment for the purpose of appeal. (Pen. Code, § 1237, subd. 1.)

The information charged that on July 26, 1958, and on August 1, 1958, Vetri and Kiley "did wilfully, unlawfully and feloniously conspire, combine, confederate and agree together to procure a female person to commit acts of prostitution; to induce another person to patronize said female person as to acts of prostitution; and to receive compensation for soliciting said patronage for said female person; that thereafter, at and in the County of Los Angeles and pursuant to said conspiracy and to effect its object, did commit the following overt acts. . . ." Ten overt acts were pleaded.

In July, 1958, Bernard Cohen lived at the Algiers Hotel in Hollywood. Carol Tuttle, called Lee Tuttle, also lived at the Algiers. Cohen first met Kiley in the bar of the Algiers and they became "chummy." Cohen introduced Lee to Kiley and told him they were living together. In the conversation Lee said she had "turned a trick" for $22.50 in the hotel with another man. Prostitutes use the word "trick" to mean "a man with whom they engage in an act of sexual intercourse." Kiley turned to Cohen and said, "Bert, ain't you got no sense? Can't you send her out on something better? She can make $50." At the end of the conversation Kiley remarked that he wanted to talk to Cohen the next day about a "good deal," that if he knew "a few girls maybe" they "could make some money."

Cohen and Kiley left the hotel and drove to a market. During the ride they talked about how to "hustle girls." Kiley told Cohen he knew some pretty fine girls that were "hustling" out of a place on "Restaurant Row" who were making pretty good money, and that if Cohen were smart he would turn Lee over to him to make some good money. Cohen said he would think about it and let Kiley know later.

On returning to the hotel Cohen and Kiley went to Lee's room. Lee asked Kiley if he was sure she could "make 50 bills for each trick" she turned. Kiley replied she could. Lee told Kiley to "Do it." Kiley told her he would talk to her about it the next day.

Cohen and Lee saw Kiley the next afternoon in the Algiers bar. Kiley asked if they had "thought about it." Cohen said they would give it a try. Kiley stated "there was a bar on La Cienega that she could work out of and turn 50 dollar bills a trick." That evening Cohen, Lee, and Kiley went for a ride in the latter's car. They drove down La Cienega and Kiley pointed to a bar called Vetri's as being the one he

had referred to earlier as the place where Lee would go to work. Cohen asked Kiley how they would split. Kiley replied it was 60 per cent for the girl and 40 per cent for the men, and they would split the 40 per cent between themselves. Cohen asked Kiley about Vetri's "cut." Kiley said he would take care of Vetri.

The next day at the Algiers bar Kiley made a phone call and told Cohen that "Bill [Vetri] would like to talk to your girl." Kiley, Cohen, and Lee drove to Vetri's bar. Kiley introduced Lee to Vetri. He introduced Cohen to Vetri as Lee's "boy friend." After some small talk "the conversation came around to prostitution." Kiley told Vetri he had told Lee that Vetri owned a bar and restaurant and that he had asked her if she would like to work in the bar. Vetri told Lee the girls would fill out a form stating they were cocktail waitresses in the bar and if someone came in and wanted "a girl for the purpose of prostitution she would be there, and if the place should ever get raided or busted, then the girl would have a legitimate excuse for being in the bar." Vetri explained to Cohen there were signals for the girls respecting their "tricks." Vetri asked Lee if she understood she was not to take any "tricks" other than the ones he pointed out to her or for which he gave her a signal. Lee replied in the affirmative. Vetri told Kiley to bring Lee back later that night. A few days later Lee went to Vetri's bar, met a man, "turned one trick," received $15, went to the Algiers, gave Cohen the money, and he gave Kiley some of it.

About a week after Lee was introduced to Vetri, Cohen told her she was wanted at the Hollywood Police Station, that if she would not go willingly they would come and get her and she would be under arrest. Cohen and Lee went to the police station. Cohen's explanation for taking Lee to the police station was that he went for his "personal benefit," he wanted to get her "off his back," he could not keep her from following him around 24 hours a day, that "she would think twice about coming back and probably she would straighten up and walk away from me." He told the police about the conversations and activities we have related. Lee was introduced to Charlene Holtzfaster, a policewoman. Miss Holtzfaster was introduced by the name "Chari." Lee was told to introduce Chari to Kiley as a "hustler" whom she had known about five years and who had been working in Washington.

The following day Kiley, Cohen, Lee, and Chari were in the Algiers bar. Lee introduced Chari to Kiley and told him she had known her about five years, that she was a "hustler" and had been out of the state. Because two officers were in the hotel lobby, they went outside to a car with Washington plates. Cohen told Kiley that Chari was the girl he had been telling him about, she was new in town, "a sophisticated prostitute," and asked what he could do to fix her up. Kiley said he would see what he could do "about fixing up to introducing her," and that he had a friend named Bill Vetri who owned a bar on La Cienega who was interested in getting "hustling girls" to work solely out of his establishment. Chari told Kiley she had worked the Washington and Oregon "circuit," she was in need of work, wanted to make some money in a hurry, and wanted the split "60-40" her way. Kiley said that would be fine, and he and Vetri could split the 40 per cent.

The next day Kiley, Cohen, and Chari went to Vetri's bar. Kiley and Chari went in. Kiley introduced Chari to Vetri. Vetri remarked that Chari looked familiar. Chari took off her sunglasses and said she had never had the pleasure of meeting him before. Kiley said to Vetri, "Bill, I knew you would be interested in meeting Chari; she's got a nice fresh look about her, a lot of class, and I think she would work out well here." Vetri told Chari he was "one of the oldest residents on the street and he had been there about 18 years; that he had never been arrested." Chari said she "could not stand any heat," she "never had a bust," and she could not afford to get arrested. Vetri told Chari the girls usually took their "tricks" to the Melrose Motel where a woman named Bea would arrange for a room. He told her he would introduce her to "tricks," that if he introduced her to one by saying "Chari, meet so-and-so" it would be an indication the man was a "trick." If he said "Chari, I want you to meet Mr. So-and-So, a friend of mine," it would indicate the man was not to be "tricked," and she would only go out to dinner with him and let him buy her drinks "but no tricks." Vetri told her to come in about 8 o'clock that night. Kiley was present during the entire conversation between Vetri and Chari. Kiley and Chari left. Kiley went to the Algiers; Chari, to the Hollywood Police Station.

At the station Chari called Vetri's number on the telephone. She asked to speak to Bill Vetri. Vetri said, "This is Bill."

She said, "Hi, Bill, this is Chari." He said, "Hi." The following conversation then took place between Chari and Vetri: Chari: "There were a few points that I didn't get to talk to you about this afternoon when I was in there. Do you have a minute?" Vetri: "Yep." Chari: "O.K. You told me that you had tricks going on a charge and a cash basis. How am I to know which is which?" Vetri: "Oh, I tell you that." Chari: "Huh?" Vetri: "I tell you that before you leave." Chari: "Oh, you will tell me before I leave?" Vetri: "Oh, yes." Chari: "Oh, I see. And do I set my own price or do I——" Vetri: "Yes. Get all you can, I don't give a damn." Chari: "Oh. Good." Vetri: "That is up to you. I have nothing to do with that." Chari: "O.K., Bill. And another thing, Johnny and I discussed the split. It was 60-40 my way; right?" Vetri: "Yep." Chari: "And if it were a cash trick I bring the 40 around?" Vetri: "Uh-huh." Chari: "O.K. Anything going?" Vetri: "Not right now, it's a little too early." Chari: "O.K. I'm just getting into the shower. I will be around in a little bit." Vetri: "O.K." Chari: "About 8:00 o'clock." Vetri: "Oh, fine." Chari: "All right." Officer Brady listened on the conversation between Chari and Vetri and it was recorded on tape.

That evening Chari went into Vetri's. Vetri was behind the bar. He said "Hello" and "Chari, meet Mr. Cameron." Chari sat down by Cameron. As Vetri was serving Chari and Cameron drinks he (Vetri) asked Chari if she was a "cop." She replied, "No." After some conversation with Cameron, Chari left, got her car, picked up two fellow officers, and telephoned to Vetri from a booth. This conversation then took place: Chari: "What was the idea of saying what you did about my being a policewoman in front of a trick? Where I used to work any time anybody mentioned the heat you ran, and I think it was a pretty dirty trick bringing up the subject in front of a trick. Don't you realize this could have ruined it?" Vetri: "Oh, well, that is all right. What did you leave for?" Chari: "Well, I just told you." Vetri: "Well, come on back, Mr. Cameron wants to give you $20 just to have dinner with him. You can keep that." Chari: "Well, according to our agreement this afternoon I was supposed to start turning tricks in there, I don't want to spend all evening having dinner with Mr. Cameron for $20." Vetri: "Well, come on back." Chari: "Another thing, I thought the arrangement was that I was supposed to eat dinner there,

and Mr. Cameron wanted to eat somewhere else." Vetri: "Come on back, he wants to pay you to eat dinner with him; then he wants to make a date with you tomorrow night." Chari: "I don't know. I don't like the looks of the setup." Vetri: "Come on back. You don't have anything to worry about unless you are a cop. Are you?" Chari: "I already told you I wasn't." Vetri: "Come on back." Chari: "I don't know if I will come back or not."

Chari then went to the police station and had this telephone conversation with Vetri. Chari: "This is Chari: I want to apologize for leaving the restaurant earlier, I got a little panicky when you mentioned police, and I would like to come back." Vetri: "Well, fine, why don't you come on over now?" Chari: "Well, is there anything there, anything going on?" Vetri: "There will be something here." Chari: "All right, I will see you." Chari returned to Vetri's with Lee. Kiley was standing at the bar. A man was sitting at the bar. Vetri said, "Chari, meet Morrie." After a drink Chari and Morrie left and went to the Melrose Motel where Morrie rented a room. In the room Morrie gave Chari $10. He partially disrobed. Chari opened the door of the room, which was a signal to the vice squad to come in, which they did. Chari gave Officer Brady the $10 bill she had received from Morrie. Brady recorded the serial number of another $10 bill on a piece of paper and gave the bill to Chari.

Chari returned to Vetri's. Vetri was sitting at the west end of the bar. Chari walked to the bar. Vetri had his hand beneath it. Chari put the $10 bill she had received from Brady in Vetri's hand. It was folded in quarters.

About two or three minutes after Chari went into Vetri's, Officers Brady, James, and Stewart entered. Brady arrested Vetri and told him "to take everything out of his pockets and place it on the bar in front of him." Vetri asked Brady what he was looking for. Brady told him. Vetri said, "Well, if you're looking for that ten dollar bill it's in the cash register on top." Brady told Vetri to accompany him behind the bar. A portion of the west end of the bar extended to the wall. There was an opening below the top portion. In order to pass through the opening to get behind the bar a person had "to duck down underneath the top portion of the bar." Vetri preceded Brady through the opening, opened the cash register, took out two or three $10 bills and handed them to Brady. None of the serial numbers matched those on the bill Chari had given Vetri. The officers then searched

Vetri and conducted a systematic search of the entire establishment. Officer Stewart found the $10 bill which Chari had given Vetri in a wastebasket at the "far west" end of the bar near the opening through which Vetri had passed in going to the cash register. The bill had been folded several times into a section about an inch by a half inch. The serial number of the bill found in the wastebasket matched the number Brady had written on the piece of paper in the motel. Vetri did not testify.

It is asserted the judgment is a nullity in that the information fails to state a public offense. The argument is that the information charges a violation of Penal Code, sections 266h and 266i, that section 266h which defines pimping requires as a necessary element that the person do the acts "knowing a female is a prostitute," that section 266i requires as a necessary element that "one procure a female for a house of prostitution, or a place where prostitution is practiced or encouraged," that since the quoted phrases are not in the information any agreement alleged cannot be a violation of either section 266h or 266i because necessary allegations are omitted.

"Section 952, which formerly required the pleading to set forth the particular circumstances of the offense charged, as amended, declares that it shall be sufficient if it be 'in any words sufficient to give the accused notice of the offense of which he is accused.' There, in a nutshell, is stated the principle of our present simplified form of pleading a criminal offense—the accused is entitled to notice of the offense of which he is charged but not to the particular circumstances thereof, such details being furnished him by the transcript of the testimony upon which the indictment or information is founded." (*People* v. *Beesly,* 119 Cal.App. 82, 85-86 [6 P.2d 114, 970]; *People* v. *Braddock,* 41 Cal.2d 794, 799 [264 P.2d 521].) "Notice of the particular circumstances of the offense is given not by detailed pleading but by the transcript of the evidence before the committing magistrate (or the grand jury); defendant is entitled to such transcript under section 870 (or § 925) of the Penal Code." (*People* v. *Roberts,* 40 Cal.2d 483, 486 [254 P.2d 501]; *People* v. *Yant,* 26 Cal. App.2d 725, 730 [80 P.2d 506].)

The information is so worded as to give defendant notice of the offense with which he was charged. It meets the requirements of Penal Code, sections 951 and 952. At no time during the trial did defendant assert he was unaware of

the charge made against him. The judgment does not, because of the form of the information, deprive defendant of due process of law, as he asserts. (See *People* v. *Quinn,* 94 Cal. App.2d 112, 116 [210 P.2d 280].)

The rules governing the sufficiency of the evidence to prove a conspiracy have been stated so frequently it is not necessary to repeat them. (*People* v. *Robinson,* 43 Cal.2d 132, 136-137 [271 P.2d 865] ; *People* v. *Curtis,* 106 Cal.App.2d 321, 325-327 [235 P.2d 51] ; *People* v. *Sica,* 112 Cal.App.2d 574, 580-581 [247 P.2d 72] ; *People* v. *Woodard,* 145 Cal.App.2d 529, 536 [302 P.2d 834] ; *People* v. *Stanley,* 162 Cal.App.2d 416, 419 [327 P.2d 973] ; *People* v. *Kefry,* 166 Cal.App. 2d 179, 185-186 [332 P.2d 848].) ▇ There was evidence of the facts we have related. Contrary to defendant's contention, when the facts are pieced together they are clearly sufficient to support the verdict. There was ample evidence to support the finding of the jury that the two defendants were engaged in a joint criminal venture as charged in the information. The argument that because the Melrose Motel was not within the city of Los Angeles there was no violation of Ordinance 41.08 is of no consequence. The evidence shows a conspiracy to violate either section 266h or section 266i of the Penal Code, and that is enough. (*People* v. *Hess,* 104 Cal.App.2d 642, 670-671 [234 P.2d 65].)

▇ Defendant asserts the court erred in permitting Officers James, Stewart, and Brady to testify that the serial number on the $10 bill which Chari. handed to Vetri and which was found in the wastebasket corresponded with the number which Brady wrote on the piece of paper in the motel at the time he gave the bill to Chari. The $10 bill was not produced. Officer Brady testified he "mixed it up with" moneys he "used for City purposes." There was no error. The evidence was clearly admissible. Further, with respect to Officer James, the objection was made after the answer was given, and there was no motion to strike. The objection did not eliminate the answer which had already been given. The answer is in the record. (*People* v. *Carmen,* 43 Cal.2d 342, 347 [273 P.2d 521] ; *People* v. *Letourneau,* 34 Cal.2d 478, 489 [211 P.2d 865] ; *Nungaray* v. *Pleasant Valley etc. Assn.,* 142 Cal.App.2d 653, 664 [300 P.2d 285].) With respect to Officers Stewart and Brady, there was no objection to their testimony that the numbers corresponded.

▇ On direct examination Chari related the telephone conversation she had with Vetri which was recorded on tape.

She was then asked, "Now, have you told us precisely the words that were spoken that telephone conversation by Mr. Vetri and by yourself, that is, the 6:43 telephone conversation?" She answered, "I have told you to the best of my recollection." Officer Brady testified to the manner in which the conversation had been recorded. Over objection, the tape was admitted in evidence and the recording was played. On cross-examination of Officer Brady, counsel for defendant Kiley requested that part of the recording be replayed. The court suggested that if part was to be replayed, it all should be replayed. Counsel for Kiley stated he had no objection. Counsel for Vetri voiced no objection. The recording was replayed in full. Defendant asserts the court erred in admitting the tape in evidence and in permitting it to be played.

It appears to be settled in this state that sound recordings, if relating to otherwise competent evidence, are admissible providing a proper foundation is laid for their admission. (*People* v. *Dabb*, 32 Cal.2d 491, 497-499 [197 P.2d 1]; *People* v. *Hayes*, 21 Cal.App.2d 320, 321-322 [71 P.2d 321]; *Wilms* v. *Hand*, 101 Cal.App.2d 811, 814-815 [226 P.2d 728]; *People* v. *Porter*, 105 Cal.App.2d 324, 330-331 [233 P.2d 102]; *People* v. *Sica*, 112 Cal.App.2d 574, 584 [247 P.2d 72]; *People* v. *Eads*, 124 Cal.App.2d 393, 398-399 [268 P.2d 561]; *People* v. *Jackson*, 125 Cal.App.2d 776, 779 [271 P.2d 196]; *People* v. *Fratianno*, 132 Cal.App.2d 610, 634 [282 P.2d 1002]; *People* v. *Avas*, 144 Cal.App.2d 91, 99 [300 P.2d 695]; *People* v. *MacKenzie*, 144 Cal.App.2d 100, 106-107 [300 P.2d 700]; *People* v. *Dupree*, 156 Cal.App.2d 60, 67-68 [319 P.2d 39]; *People* v. *Zuniga*, 156 Cal.App.2d 298, 303 [319 P.2d 111]; *People* v. *Grace*, 166 Cal.App.2d 68, 74-75 [332 P.2d 811]; 58 A.L.R.2d 1024.) The sound recording related to competent evidence, and a proper foundation for its admission was laid. The fact that Chari and Officer Brady testified to their recollections of the conversation did not make the tape inadmissible or render playing the recording error. It is held that a sound recording is admissible as corroborative of oral testimony. (*Wilms* v. *Hand*, 101 Cal.App.2d 811, 814-815 [226 P.2d 728]; *People* v. *Jackson*, 125 Cal.App.2d 776, 779 [271 P.2d 196].) Obviously, a recording is more reliable and satisfactory evidence than testimony from memory; it is more trustworthy; it reproduces the very words used by the person or persons who make the statements, in their own voices, and with all

the added significance that comes from inflection, emphasis, and the various attributes of speech. The point is without merit.

It is asserted the district attorney was guilty of prejudicial misconduct. The point is entirely without foundation. The argument is that the district attorney knowingly presented evidence with respect to the serial number on the $10 bill which Chari gave to Vetri when he knew the police had wilfully suppressed the bill and ''there was a deliberate asking of improper questions regarding the tape recording immediately after the witness had already related the conversation which was recorded.'' There is not the slightest support in the record for the assertion that the police ''wilfully suppressed'' the $10 bill. As we have seen, the evidence with respect to the serial number on the bill and with respect to the tape was properly admitted, and the playing of the recording was not error.

We find no error in the record.

The appeal from the verdict is dismissed. The judgment (order granting probation) and the order denying a new trial are affirmed.

Shinn, P. J., and Ford, J., concurred.

A petition for a rehearing was denied March 24, 1960, and appellant's petition for a hearing by the Supreme Court was denied April 20, 1960.