*75
 
 KAUFMAN, P. J.
 

 The appellant, Elijah Means, and a co-defendant were charged by indictment with one count of conspiracy (Pen. Code, § 182) and three counts of violation of section 11500 of the Health and Safety Code. The indictment also charged the appellant with several prior convictions for violating section 11500 of the Health and Safety Code, all of which were admitted before trial. A jury trial resulted in a verdict of guilty on all four counts of the indictment: (1) conspiring to sell narcotics; (2) possession of marijuana; (3) transporting marijuana; and (4) furnishing and giving away of marijuana.
 

 On appeal from the judgment of conviction and the order denying his motion for a new trial, the appellant argues: (1) That as the evidence was insufficient to support the conviction on the conspiracy count, the Superior Court of Marin County had no jurisdiction to try him on the remaining counts of the indictment; (2) That the trial court committed prejudicial error in allowing the reading of a deposition of an absent witness under section 1345 of the Penal Code; and (3) That certain evidence obtained in the search of a ear not owned by the appellant and not within his exclusive possession was erroneously admitted against him. There is no merit in any of these contentions.
 

 The first contention on appeal is that the evidence is insufficient to support the verdict on the conspiracy count. The appellant admits the existence of a conspiracy of his codefendant Stone and others, but argues that the evidence is insufficient to establish his role in it. For an examination of the appellant’s argument, a detailed chronological exposition of the various transactions is necessary.
 

 In April of 1957, one John Kane who had been recently discharged from the United States Air Force, moved into an apartment in Larkspur with a former air force buddy, Max Mendel. In 1957, Mendel proposed to Kane that they smuggle narcotics into this country from Mexico. Mendel said he had business connections in Mexico for obtaining narcotics and outlets in the Bay Area for distribution. Kane agreed and in the early part of June, Mendel made a trip to Mexico and returned with 20 pounds of marijuana which he had purchased at $25 per pound near Monterrey, Mexico. Mendel was unable to sell the marijuana through his connection in the Bay Area and asked Kane to find one. Kane contacted one Swain at the Hamilton Air Force Base, who said he thought he could dispose of it in San Francisco. Kane and Swain went to San
 
 *76
 
 Francisco and sold to one Gilbert one pound of marijuana for $80; the next night, they sold a pound of marijuana for $80 to one Birdwell in Santa Rosa. Swain also bought a pound of "marijuana for $80 from Kane at Hamilton Air Force Base.
 

 As Mendel and Kane still had 17 pounds of marijuana in "their inventory, Mendel suggested to Kane they approach one Charles H. Stone, a cook at the air force base. Stone agreed to dispose of the narcotics but stated he would have to contact his friends in the East Bay first. Mendel agreed to sell the marijuana to Stone for $50 per pound. About three days later, Stone phoned Mendel about 3 a.m. and informed him he had arranged to sell the marijuana in the East Bay and wanted 6 pounds delivered to him at the Black Point cut-off road at the county line. Mendel and Kane met Stone at the county line and sold him 6 pounds of marijuana in 2-3 pound paper bags and received a part payment of about $150. Several nights later, Stone appeared at the Larkspur apartment and paid Mendel the remaining $150 of the purchase price. At this time, Stone told Mendel and Kane that the marijuana was of an'inferior quality and he was having trouble getting rid of it. However, three days later, Stone again appeared at the Larkspur apartment and picked up eight pounds of the marijuana that Mendel had obtained in Mexico and subsequently paid for it.
 

 In the latter part of June, Stone again visited Mendel and Kane at their apartment and complained of the poor quality of the marijuana, that he was having trouble disposing of it, and he was not making enough profit on the sale to deem it advisable to continue selling it. Mendel then mentioned the possibility of going into the heroin business but thought it would be difficult to distribute. Stone, however, said he had channels through which to sell it and had a partner by the name of Elijah who was in Sacramento. Stone stated he would rather deal in heroin as it was easier to dispose of and there was a greater profit and was sure he could arrange for distribution as he had in the past. Mendel then mentioned he would go to Mexico again to obtain some heroin.
 

 In late June or early July, Stone and the appellant went to a home of one Wilbur Jiggetts in San Francisco. Stone introduced the appellant to Jiggetts as “my partner Elijah.” Jiggetts, who had also been stationed at Hamilton Air Force Base, was a former acquaintance of Stone’s. Stone then advised Jiggetts he had access to a large quantity of marijuana and asked Jiggetts if he would help him dispose of it. Jiggetts
 
 *77
 
 agreed to do so and Stone promised Jiggetts he would get something out of it. Three days later, Stone met Jiggetts at Hamilton Air Force Base and said he had a quantity of marijuana to sell but wanted Jiggetts to smoke it first to see if it was of acceptable quality. Stone and Jiggetts then drove to the Black Point cutoff where Stone handed Jiggetts some marijuana and brown cigarette paper. After rolling and smoking the marijuana cigarette, Jiggetts said it was of good quality.
 

 Stone then drove to a near-by gas station, made several phone calls and then told Jiggetts that they were going to pick up some marijuana. They drove to the Larkspur apartment of Kane and Mendel and picked up a suitcase. After returning to Jiggetts’ home in San Francisco, they opened the suitcase and found several paper bags. Stone gave one of the paper bags to Jiggetts. One of these contained one pound of marijuana and was later introduced into evidence at the trial. Stone and Jiggetts then drove to an address on Grove Street in San Francisco where a woman named “Puddin’ ” Johnson took the remainder of the marijuana from Stone and agreed to pay for it when it was sold. Stone took Jiggetts back to his home and left.
 

 A few days later, the appellant and Stone again visited Jiggetts at the latter’s home in San Francisco. All three of them smoked a marijuana cigarette. Stone said he had access to heroin and wondered if the Johnson woman would also buy that. Jiggetts replied he did not know. Therefore, the appellant, Jiggetts and Stone left and drove to the address on Grove Street. When they arrived, Jiggetts went in alone to tell her Stone was outside and wanted to know if she could find sales for heroin. “Puddin’ ” Johnson stated she would try to find an outlet and made a phone call. Jiggetts then returned to the car and told Stone that “Puddin’ ” had contacted a person who was coming over and that he was going into the house to wait for the contact. The contact soon arrived and discussed the sale of heroin with Stone. They dickered over the price and agreed on $600 per ounce if it was exceptionally clear and uncut. Stone and Jiggetts left the house and returned to the car where they discussed the above transaction with the appellant.
 

 Over the July 4 week end, Mendel and Kane went to Tijuana, Mexico, where Mendel made the arrangements to buy the narcotics. He soon discovered it was impossible to obtain heroin but bought 10 pounds of marijuana for $150. They
 
 *78
 
 returned to Larkspur, weighed the marijuana and put it in one pound bags which were stored in Mendel’s closet. On July 9 or 10, Stone contacted them and after finding out that they had obtained the marijuana, asked them to deliver six pounds to him at the Flying A gas station just north of Hamilton Air Force base. Kane then drove to the station and saw Stone and a girl in his car and transferred 6 pounds to Stone’s car. A few days later, Mendel and Kane drove to San Francisco and sold the remainder of marijuana for $200 to a friend of Gilbert’s. Then Mendel and Kane went to the Hamilton Air Force Base and met Stone who claimed the second portion of marijuana was not much better than the first and again said there was no money in its sale and that Mendel should try to obtain heroin as he could dispose of large quantities in the East Bay. Mendel said he was making arrangements to go back to Mexico and would leave as soon as these were worked out.
 

 On or about the 10th or 12th of July, Stone picked up his girl friend, Racheal Smith, and drove to Sacramento with her. On the way, they stopped at the appellant’s home in Vallejo. When Stone and Racheal arrived there about 7 p.m., Stone and appellant went into the back bedroom and left Racheal alone in the living room. They came out of the bedroom after about an hour. Then the appellant, his girl friend, Frances, Stone and Racheal went to Sacramento in Stone’s ear. Frances was carrying a package about half the size of a shoe box covered with a white handkerchief. On arriving in Sacramento, Stone parked the ear on Fourth Street. Stone and appellant left the car and were gone about three hours. When the appellant came back to the ear, Frances gave him the package. The appellant took the package across the street and gave it to several men sitting in a black Cadillac, and returned with a portable television set which he put in the back seat of the ear. When Stone returned a little later, he and the appellant put the television set in the trunk of the car. [This television set was later found in appellant’s apartment by police officers and was introduced into evidence at the trial.] All four returned to Vallejo and brought the television set into the appellant’s home. Later, when Racheal asked Stone what was in the package they had taken to Sacramento, Stone replied “the weed.”
 

 About three days later, Stone and Racheal again went to appellant’s home in Vallejo. The two men went into the back bedroom and after some time left the house and told Racheal
 
 *79
 
 they were going to Sacramento. They returned about 3 or 4 in the morning. Eacheal again questioned Stone as to what he had been doing and what was in the package they took to Sacramento and Stone told her it was marijuana.
 

 On about August 1, 1957, Eacheal and Stone drove to a gas station where he parked his car and made a phone call and then waited. John Kane drove up and gave Stone two packages in brown paper. Stone told Kane to tell Mendel not to be impatient. Stone put the packages into the trunk of his car. They left the gas station and Eacheal again asked Stone what was in the packages. Stone replied that she asked too many questions and refused to tell her. They continued driving and again went to the appellant’s home in Vallejo. Stone left the packages in the car and he and Eacheal entered the house. Stone and the appellant again went into the back bedroom while Eacheal remained in the living room. Subsequently, Stone and the appellant returned from the back bedroom and told her that they were going to Sacramento and left in the car about 9 p.m. They returned about midnight and Stone picked up Eacheal and returned to Hamilton. Eacheal again asked what the packages contained and Stone replied that it was marijuana.
 

 On July 17, Eacheal and Stone again went to appellant’s house in Vallejo. Eacheal remained in the living room while the appellant and Stone went into the back bedroom. When Eacheal later joined the appellant and Stone in the bedroom, they were taking a light brown weed out of a large paper sack and putting it in smaller bags and then on a scale to check the weight. They made up several bags weighing two pounds each. Then appellant said the substance was “the weed.” The appellant and Stone then took the smaller bags and again left for Sacramento, returning about midnight.
 

 On July 19, Mendel left for Mexico. He had stated he made arrangements with friends in the East Bay to buy heroin in Laredo. On July 24, Mendel and another man were stopped by a customs’ agent in Laredo, Texas. Mendel’s car was searched and 34 pounds of marijuana and six packets of heroin were found in the car, and the two men arrested. Some time during the night of July 24, Mendel committed suicide in the Laredo jail. The marijuana and heroin were subsequently brought to California and introduced into evidence at the trial.
 

 On July 25, Kane learned that Mendel had committed suicide in jail. About an hour later, he saw Stone at the
 
 *80
 
 Flying A gas station close to Hamilton Air Force Base and told him that Mendel had been caught crossing the border with narcotics and had committed suicide. Stone advised Kane to go to the Larkspur apartment and clean up the place. Later that day, the chief of police of Larkspur, an agent of the United States Customs’ Bureau and an O.S.I. man from Hamilton went to the Larkspur apartment. After showing Kane a search warrant, they were admitted and with Kane’s permission searched the house. They found residue of narcotics in the bedroom and a marijuana seed in the living room. When the officers informed Kane they knew Mendel had been smuggling narcotics into the country and bringing it into the Bay Area, Kane made a full confession and subsequently testified at the trial. About a week after Mendel’s death, Stone met Racheal at Hamilton and told her he had lost a lot of money in the dope.
 

 In view of the above evidence, there can be little doubt that the appellant was one of the members of the conspiracy. While mere association with the perpetrator of a crime is not sufficient, an entirely different situation arises when it is shown that a conspiracy is already in existence and that acts are being committed in furtherance thereof.
 
 (People
 
 v.
 
 Massey,
 
 151 Cal.App.2d 623 [312 P.2d 365].) The appellant’s association with Stone must be viewed in the light of the existing conspiracy of Mendel, Kane and Stone.
 

 Kane testified that when he and Mendel conferred with Stone in the latter part of June, Stone mentioned that he had a partner named Elijah up in Sacramento who knew a lot of people there and could arrange for the disposition of the narcotics without difficulty. The record showed that the appellant and Stone made several marijuana selling trips to Sacramento after Mendel had returned from Mexico with marijuana. Appellant attempts to argue that his position is supported by Kane’s testimony that he had never seen the appellant at any time during the duration of the conspiracy. However, there need be no showing of direct association between members of a conspiracy. Common design is the essence of a conspiracy and the crime can be committed whether the parties comprehend its entire scope, whether they act in separate groups or together, by the same or different means known or unknown to them, if their actions are consistently leading to the same unlawful result; in the instant case, the sale and distribution of narcotics.
 
 (People
 
 v. Drake, 151 Cal.App.2d 28 [310 P.2d 997].) Aside from
 
 *81
 
 Kane’s testimony, appellant’s participation is adequately supported by the testimony of Jiggetts, and Racheal Smith. There is also the television set which the police officers found in his home after his arrest. The appellant first stated that Stone had left the television set at his apartment only the day before but subsequently admitted that the television set was his.
 

 Appellant further argues that there is nothing to connect the marijuana which he and Stone took to Sacramento with the marijuana obtained by Mendel and Kane. He relies on
 
 Anderson
 
 v.
 
 Superior Court,
 
 78 Cal.App.2d 22, where the court pointed out at page 23 [177 P.2d 315] that a conspiracy between A and B to commit a specific crime or crimes will not make A liable as a conspirator with B and C if B and C enter into a separate conspiracy to commit a different crime or crimes. In that case, however, the court also pointed out that it was well settled that one who joins a conspiracy after its formation is liable as a conspirator just as all those who originated it, nor is it necessary that such conspirator should have seen the others or have knowledge as to who all the members of the conspiracy are. The court went on to point out that all of the conspirators need not be acquainted with one another. A showing of direct association is not necessary.
 
 (People
 
 v.
 
 Sherman,
 
 127 Cal.App.2d 230 [273 P.2d 611].)
 

 The existence of the assent of minds which is involved in a conspiracy may be, and from the secrecy of the crime must be, inferred by the jury from the proof of facts and circumstances which, taken together, apparently indicate that they are mere parts of the same complete whole.
 
 (People
 
 v.
 
 Benenato,
 
 77 Cal.App.2d 350 [175 P.2d 296].) The actual fact of conspiracy may be inferred from circumstances, and the concurring conduct of the defendants need not be directly proved. Any joint action on a material point or collocation of independent but conspiring acts by persons closely associated with each other, is held to be sufficient to enable the jury to infer concurrence of sentiment; and one competent witness will suffice to prove cooperation of an individual conspirator.
 
 (People
 
 v.
 
 Fitzgerald,
 
 14 Cal.App.2d 180 [58 P.2d 718].)
 

 On appeal we must assume in support of the judgment the existence of every fact which the jury could reasonably have deduced from the evidence, and then determine whether the facts justify the inference of guilt. If the circumstances reasonably justify the verdict of the jury, the
 

 
 *82
 
 opinion of the reviewing court that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant interference with the determination of the jury.
 
 (People
 
 v.
 
 Daugherty,
 
 40 Cal.2d 876 [256 P.2d 911].) We think that in the instant case, the jury could reasonably infer that the marijuana which the appellant and Stone sold to Jiggetts and the marijuana which the appellant and Stone sold in Sacramento, was part of the marijuana obtained by Mendel on his various trips to Mexico. The inference that the appellant was a member of the conspiracy is compelled if the record is believed.
 

 Therefore, we can deal briefly with appellant’s jurisdictional argument. The crimes charged by second, third and fourth counts of the indictment, respectively, the possession, transportation and furnishing of narcotics, are chargeable to the appellant only by means of the established rule of law, that the acts of one coconspirator are chargeable against all.
 
 (People
 
 v.
 
 Miner,
 
 96 Cal.App.2d 43 [214 P.2d 557];
 
 People
 
 v.
 
 Woodard,
 
 145 Cal.App.2d 529 [302 P.2d 834].) Section 182 of the Penal Code provides: “All cases of conspiracy may be prosecuted and tried in the superior court of any county in which any overt act tending to effect such conspiracy shall be done.” As pointed out above, the appellant was a member of the conspiracy. A defendant need not have himself committed the overt act within the county in which he is tried, where it is shown that he was a member of the conspiracy and that any of his coconspirators committed any one of the overt acts charged within the county.
 
 (People
 
 v.
 
 Anderson,
 
 90 Cal.App.2d 326 [202 P.2d 1044].) There can, therefore, be no question in the instant ease that the Superior Court of the County of Marin had jurisdiction to try the appellant on the second, third and fourth counts of the indictment.
 

 The next contention on appeal is that the trial court committed prejudicial error in allowing the deposition of the witness, Racheal Smith. Appellant argues that “where a witness has in the past indicated a willingness to attend trial,” the fact that it is shown that the witness is out of the state, is not sufficient compliance with section 1345 of the Penal Code. That section provides:
 
 *83
 
 the State. Upon reading the deposition in evidence, the same objection may be taken to a question or answer contained therein as if the witness had been examined orally in Court.” (Enacted 1872.)
 

 
 *82
 
 “The deposition, or a certified copy thereof, may be read in evidence by either party on the trial, upon its appearing that the witness is unable to attend, by reason of his death, insanity, sickness, or infirmity, or of his continued absence from
 

 
 *83
 
 Appellant argues that where a witness is out of state and in contact with the district attorney and willing to attend the trial, the requirement of the statute cannot be met by a mere showing that at the time of trial the witness was absent from the state. In the instant case, the witness had left for Tennessee and then came back at the request of the district attorney to give her deposition. She then again left California before trial. We cannot agree that section 1345 contains a requirement of due diligence which would in effect require the district attorney to furnish transportation to out of state witnesses. This aspect of the above quoted statute has been discussed only in
 
 People
 
 v.
 
 Williams,
 
 123 Cal.App.2d 226 [266 P.2d 599]. In that case a witness had gone to Mexico City before trial, because his mother was dying, and indicated that he would probably be back in time for the trial. As he was not back in time for the trial, the court admitted into evidence the transcript of his testimony at the preliminary hearing where the witness was cross-examined separately by three attorneys. On appeal, it was held that the court had not abused its discretion in admitting the transcript of the preliminary.
 

 It does not appear from the language of section 1345 of the Penal Code that the Legislature there intended to impose a requirement of due diligence, as in section 686 of the Penal Code. Even under section 686, it has been held that where the evidence is sufficient to show that the witness is absent from the state, the due diligence requirement is inapplicable.
 
 (People
 
 v.
 
 Carswell,
 
 51 Cal.2d 602 [335 P.2d 99];
 
 People
 
 v.
 
 Perez,
 
 170 Cal.App.2d 27 [338 P.2d 255].) We think that section 1345 of the Penal Code means exactly what it says— that if the witness is out of the state, the deposition may be read into evidence provided that the witness was examined in accordance with sections 1335-1344 of the Penal Code.
 

 We do not think that the statute requires that the witness be both out of the state and unwilling to attend the trial, or that the other party pay for the transportation of an out-of-state witness. (Even a witness who is within the state is not obliged to appear unless the judge of the court in which the offense is triable has endorsed the subpoena and order to show
 
 *84
 
 that the attendance of the witness is material and necessary. Pen. Code, § 1330.)
 

 The record here indicates that the witness was examined in accordance with these provisions and that the notice required by law was given to the defendants who appeared at all times in person and with their attorneys. Therefore, it was sufficiently established that the witness Eacheal Smith was out of the state at the time of trial and the deposition properly admitted.
 

 The final argument on appeal is that the trial court erred in admitting into evidence a portion of a smoked marijuana cigarette or “roach” found in the vehicle in which he was riding shortly before his arrest.
 

 The record reveals the following facts: On October 8, 1957, several police officers talked to the appellant at the Santa Eosa police office. The appellant stated that a 1950 Buick automobile parked in the vicinity of the office belonged to him and he was transferring possession of it to one Miss Davis because [as a parolee], he did not have permission to own or drive the car. The car was registered in the name of Johnson and Miss Davis subsequently denied ownership. Thereafter, the appellant admitted that the car was his. The officers searched the car and on the front seat, they found a seed, some green material and in the right rear ash tray, they found the “roach.” After the officers informed the appellant that they had found some narcotics in the car, the appellant said he often lent his ear to Stone and if anything was found in the car, it was Stone’s.
 

 The “roach” was introduced to show that the appellant had narcotics in his possession in order to corroborate the conspiracy. Appellant admits that only slight evidence is required for corroboration, but relies on section 1111 of the Penal Code to argue that the “roach” was improperly admitted as there was only the slightest evidence to connect the appellant with the “roach.” We cannot agree.
 

 Section 1111 of the Penal Code provides:
 

 “A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.
 

 “An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the de
 
 *85
 
 fendant on trial in the cause in which the testimony of the accomplice is given.”
 

 It has been held that the finding of narcotics in a room occupied by the defendant raises a reasonable inference that the drug belongs to the appellant even though he may share the room with another.
 
 (People
 
 v.
 
 Van Valkenburg,
 
 111 Cal.App.2d 337 [244 P.2d 750].) In the instant ease, the presence of the “roach” in an automobile in which the appellant was riding only a few minutes earlier, raises a reasonable inference that it was his.
 
 {People
 
 v.
 
 One 1940 Chrysler,
 
 77 Cal.App.2d 306 [175 P.2d 585].) We can only conclude that, therefore, the “roach” found in the car “tends” to connect the appellant with the conspiracy charged.
 

 As pointed out above, the “roach” was introduced here merely for purposes of corroborating the testimony relating to appellant’s role in the conspiracy. It was properly admissible as it was found in a car which the appellant admitted belonged to him. It is axiomatic that corroborating evidence may be slight, and need not be direct or extend to every fact and detail. Circumstantial evidence, such as the “roach,” confined as here to proof of a conspiracy, may properly be admitted.
 
 {People
 
 v.
 
 Trout,
 

 *
 
 {Cal.App.) 2 Cal.Rptr. 445.) The corroborating evidence is sufficient if it tends to connect the defendant with the commission of the crime or from which such connection is reasonably infer-able.
 
 {People
 
 v.
 
 Lyons,
 
 50 Cal.2d 245 [324 P.2d 556];
 
 People
 
 v.
 
 Roach,
 
 148 Cal.App.2d 364 [306 P.2d 523].) The corroborating evidence need not by itself establish that the crime was committed or show all the elements thereof, but it must relate to some act or fact which is an element of the offense.
 
 {People
 
 v.
 
 Owens,
 
 177 Cal.App.2d 80, 82 [1 Cal.Rptr. 861].)
 

 Furthermore, under the facts of the instant case, Raeheal Smith was not an “accomplice” within the meaning of the statute.
 
 {People
 
 v.
 
 Olds,
 
 154 Cal.App.2d 78 [315 P.2d 881] ;
 
 People
 
 v.
 
 Seiffert,
 
 81 Cal.App. 195 [253 P. 189];
 
 People
 
 v.
 
 Baskins,
 
 72 Cal.App.2d 728 [165 P.2d 510].) The fact that a witness may be punishable for cooperation with the accused does not make him an accomplice.
 
 {People
 
 v.
 
 Alvarez,
 
 73 Cal.App.2d 528 [166 P.2d 896].) There
 
 *86
 
 fore, her testimony sufficiently corroborated that of Kane and Jiggetts.
 

 Judgment of conviction affirmed. Order denying motion for new trial affirmed.
 

 Draper, J., and Good, J. pro tem.,
 
 *
 
 concurred.
 

 A petition for a rehearing was denied April 20, 1960.
 

 *
 

 A hearing was granted hy the Supreme Court on March 23, 1960. The final opinion of that court is reported in 54 Cal.2d - [6 Cal. Rptr. 759, 354 P.2d 231].
 

 *
 

 Assigned by Chairman of Judicial Council.