Filed 6/6/14  P. v. Molina CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>HECTOR DAVID BETANCES MOLINA,<br><br>        Defendant and Appellant. | A136914<br><br>(Contra Costa County<br>Super. Ct. No. 50809020) |

Following a 2008 indictment, and an extended period during which criminal proceedings were suspended due to doubts about his competency to stand trial, the trial of defendant Hector David Betances Molina commenced in late May 2013.  The jury convicted him of three counts of first degree murder; one count of second degree murder; two counts of attempted murder; one count of conspiracy to commit murder and assault with a deadly weapon; and one count of participation in a criminal street gang.  The jury also found true a number of enhancement allegations relating to defendant's personal use of a firearm, his personally inflicting great bodily injury, and his gang connections for all but one of the offenses.  The trial court sentenced defendant to state prison for an aggregate term of 169 years and four months, to be served consecutive to a term of life without the possibility of parole.

Defendant asserts three arguments on appeal:  (1) substantial evidence does not support the trial court's decision that he was competent to stand trial; (2) the trial court abused its discretion when it excluded testimony from defendant's mother regarding defendant's credibility; and (3) two of his four murder convictions must be reversed

1

because there is no substantial evidence from which a reasonable jury could conclude that defendant "perpetrated, aided and abetted, or conspired to commit" the two offenses. We conclude that none of these arguments has merit, and we affirm.

## BACKGROUND

It will not be necessary to recapitulate the trial record of more than 4,000 pages. Defendant directly challenges only two of his nine convictions. He does not challenge the gang-related count and enhancements, evidencing that he does dispute his gang membership or that a number of crimes were committed "with the specific intent to promote, further, or assist in any criminal conduct" by a criminal street gang (Pen. Code, § 186.22, subd. (b)). The evidence in connection with the two challenged murder counts will be recounted when the merits of defendant's attack are considered at a later point in this opinion. A narrative encompassing the unchallenged convictions may therefore be reduced to the following:

According to the prosecution's gang expert witness and former gang members, by 2007, the VFL and ML Sureño gangs were encountering hard times. Gang members were breaking the prohibition on killing other members, and successive leaders were forced to leave the country. Following an informal amalgamation, VFL and ML members sought to boost their waning prestige with a strategy of killing rival Norteño gang members. Defendant was a member of VFL and one of the members hunting down Norteños.

Defendant went hunting on the night of December 22, 2007. Defendant was one of a number of Sureños who hid behind a fence until some Norteños came into view and then opened fire. Defendant killed Antonio Cintron (count one) and attempted to kill Adrian Espinoza (count two) and Neil Wixon (count three). Defendant was also convicted of conspiring to kill (count four) and engaging in gang activity (count five).

On February 16, 2008, defendant was driving one of the two vehicles full of Sureños. When a suspected Norteño was found, defendant told the others to "get that motherfucker." Other gang members got out and killed Luis Perez (count seven).

2

Defendant was arrested on February 27, 2008, and was never thereafter out of custody. While in custody, defendant had a number of telephone calls with his mother and the then VFL leader. The calls were recorded. During the conversation, defendant made a number of statements that could be construed as confessing to murder. Defendant also made a number of incriminating statements—including that he had shot Antonio Cintron—to a VFL member who had agreed to become a police informant. The informant also testified that two other gang members identified defendant as Cintron's murderer.

February 27 was also the day on which homeless bystander Lisa Thayer was killed (count eight) when she was caught between Sureños firing at the occupants of a passing car.

On April 26, 2008, Rico McIntosh was shot on the streets of San Pablo. Before he died of his wounds (count nine), McIntosh told police that he had been shot by the Hispanic male occupants of a vehicle. McIntosh was killed by VFL members in the mistaken belief he was a Norteño.

Defendant did not testify in his own behalf. The only witnesses called for the defense were: (1) Adrian Espinoza, who testified that he was unable to identify who shot him; (2) a private investigator, who testified that Espinoza gave him a version of the shooting that differed from his trial testimony; and (3) Dr. Carol Walser, who testified to defendant's low I.Q. and lifelong impaired cognitive functions which placed him "at the mental retardation level."

## REVIEW

### Substantial Evidence Supports The Trial Court's Determination That Defendant Was Competent To Stand Trial

State and federal constitutional law require a defendant to understand the proceedings against him and to be able to assist in his defense. (*People v. Elliott* (2012) 53 Cal.4th 535, 582-583; *Godinez v. Moran* (1993) 509 U.S. 389, 396.) "Under California law, a person is incompetent to stand trial 'if, as a result of mental disorder or

developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner.' " (*People v. Young* (2005) 34 Cal.4th 1149, 1216, quoting Pen. Code, § 1367, subd. (a); accord, *People v. Rogers* (2006) 39 Cal.4th 826, 846-847.)  A defendant is incompetent to stand trial if he or she lacks a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding, and a rational as well as a factual understanding of the proceedings against him.  (*Drope v. Missouri* (1975) 420 U.S. 162, 171; *Dusky v. United States* (1960) 362 U.S. 402.)

A defendant is presumed competent unless by a preponderance of the evidence he proves that he is not competent.  (Pen. Code, § 1369, subd. (f); *People v. Lawley* (2002) 27 Cal.4th 102, 131.)  An appellate court conducts a deferential standard of review to determine whether substantial evidence supports the trial court's finding.  (*People v. Dunkle* (2005) 36 Cal.4th 861, 885; *People v. Marshall* (1997) 15 Cal.4th 1, 31.)

Here, at the conclusion of a three-day evidentiary hearing, the trial court ruled that defendant was competent to stand trial.  The ruling is thoughtful indeed; it takes up 11 pages in the reporter's transcript and appears to have been prepared in advance and read into the record.  Extensive excerpts deserve quotation:

"Defendant's claim of incompetency rests almost exclusively on the testimony of Dr. Patricia Spivey . . . .  She testified that it was her opinion that the defendant is unable to understand the nature of the proceedings, that is, unable to understand what a trial is all about.  She further opined that he suffers from an ongoing and long-term learning disability, which probably accounts for this inability on his part to understand.  [¶] Her opinion with regard to defendant having a learning disability of some sort appears to me to be well-supported.  [¶] In my opinion these mental deficits which appear to have existed from youth probably qualify him as developmentally disabled as that term is used in Penal Code 1367 and 1370.1.  [¶] . . .[¶]

"The real issue in this case . . . is not whether . . . Mr. Molina is developmentally disabled or mentally disordered.  The real question that I'm facing is whether as a result of whatever mental deficits he has, he is rendered unable to understand what's going on

4

in trial. That's really the key thing that I've been called upon to decide in this matter. [¶] Dr. Spivey admitted that her opinion that defendant's mental deficits would keep him from being able to understand what's going on in trial is based primarily on the results of a CAST . . . more particularly, on the results of that portion of the test which is designed to determine whether . . . the person taking the test knows the roles of various participants in trial. . . .

"The defendant scored poorly on the test. For a number of reasons, however, I seriously question the reliance that Dr. Spivey placed on the results of this text. For one thing, the test assumes there is only one correct answer to each of the test questions. . . . [¶] . . . [¶] . . .Then too, absent evidence of malingering, the test accepts as true any 'I don't know' response that may be given to any question. [¶] But just because a person says he or she doesn't know does not necessarily mean that is, in fact, the case. There is evidence, for example, that the defendant . . . sometimes says that he doesn't know something when, in fact, he does."

"Additionally, his . . . 'I don't know' responses to such questions as: What does a judge do, what does a prosecutor do, et cetera, should not have been accepted at face value, . . . given the fact that only a couple of months earlier defendant gave responses on tests administered by Mr. Juan Velasquez . . . demonstrating that he, in fact, knew very well the role of such individuals. Dr. Spivey explains this disparity . . . as being the function of defendant's retention limitations. [¶] This explanation is not . . . satisfactory. It's hard to believe that a person such as defendant, who knew as far back as 2008 and as recently as August 2011 that a witness was a person who saw the crime would no longer be able to remember this two months later in November of 2011 and think instead that a witness was a member of the jury. [¶] As Dr. Solomon pointed out, a person with so great a retention limitation as this would be expected to manifest all manner of other difficulties which, in fact, were not exhibited by defendant. [¶] . . .[¶]

"Above my reservations about the value of the CAST-MR results in this case and the negative opinion this has on the weight I am prepared to give Dr. Spivey's opinion testimony, there is the matter of other evidence presented in this case. I'm referring

primarily to the video interview conducted of the defendant by the police in 2008 and the . . . phone conversations defendant had with his mother and others shortly thereafter while he was in jail, and also to some extent the more recent observations of the defendant made by his jailers. [¶] I find this other evidence very revealing as to whether defendant would be able to understand what goes on at a trial and . . . assist his counsel in providing a defense at such trial.

"First of all, I call your attention to the very early portion of that interview where the defendant not only states expressly that he understands his *Miranda* rights, that is his right to remain silent, . . . the fact that anything he says might be used against him, his right to an attorney and the right to have an attorney appointed free of charge. Not only does the defendant expressly say that he understands this matter, but he demonstrated this. He demonstrated the fact he understood these rights, or at least the right to remain silent, by identifying it as one of the *Miranda* rights even before the police told him what the *Miranda* rights consist of.

"Additionally, . . . he actually invoked his right to remain silent towards the end of the interview when it became clear . . . to him that the police were not buying his story. Such a person would clearly understand his right not to be compelled to testify at trial and would appreciate the circumstances when such right should be exercised. . . .

"Now turning to the interview of a whole . . . [¶] . . . [D]uring the course of the interview it's clear that Mr. Molina understood that the police were, in effect, accusing him or charging him of the murder. He clearly understood the consequences of those charges. That is, if they were established, that he would go to prison for life. [¶] And most importantly he formulated a defense to those charges. . . [¶] . . . In fact, formulated might be too soft a word, fabricated a defense. As we later learned during the course of his conversation with his mother, . . . he effectively admitted that he had committed the crime. But with the police, not only did he deny committing the crime, he gives an explanation of why he couldn't have done the crime, to wit, he wasn't there."

"Significantly, he also understood that . . . the burden was . . . in this regard . . . on the People to prove that he was guilty. They kept on inviting him to prove his innocence,

6

to prove that he wasn't there . . . . And he kept on telling them, no, you have to prove that I was there. . . . [¶] Additionally . . . , he demonstrated during the course of this interview . . . that he was able to evaluate the worth of the police evidence" and "to suggest line of attacking that evidence."

Moreover, "defendant did not allow himself to be tricked by the police [into] implicating himself, nor did he buckle under . . . their strong and persistent pressure. [¶] If we were dealing with a feeble-minded person who didn't understand what was going on, one would expect that he would succumb to these ploys of the police. Not at all. He knew exactly [what] they were saying and formulated a defense to it and stuck to his guns throughout the entire [interview]." "During the interview he gave every appearance of being very attentive and very comprehending. . . . [¶] . . . [T]his video of the interview shows that the defendant clearly understood what was going on . . . He was very understanding of the situation he was in."

"I'll also note some highlights that I think are telling from the phone calls that he had with his mother and others from the jail. . . . [D]uring the course of those phone calls . . . he was giving instructions on how someone is to find a phone number on his cell phone directing . . . how you pull that information out of the cell phone. At another point he indicated that he realized his taxes had to be filed, important things like this to be done. And he gave directions that someone should do that.

"Another point: He talked about how his car should be sold so money could be raised to provide him with food and other items while he was in jail . . . [A]nother aspect which I found very telling was that he explained that someone had to see a traffic judge. Appears he had received a ticket and explained that he was in jail, so he wouldn't get in greater trouble for [not] paying the ticket.

"Additionally, he made arrangements with one of his . . . fellow gang members . . . to take care of his mother. And then, more recently he was observed . . . by the jailers, by various guards at the detention facility, processing requests not only on his own behalf but on behalf of other inmates . . . which appears that . . . other cellmates were relying on him to do this on [their] behalf.

7

"Look, I do not believe that it takes a rocket scientist to understand what goes on a trial and to be able to assist counsel in such a proceeding. And I do not believe that the due process requirements of the United States and California Constitutions require any greater understanding of what takes place at a trial than the defendant demonstrated that he is capable of in the interview he had with . . . police, his jail phone conversations with his family and his conduct in jail.

"I do not believe that it has been established by a preponderance of the evidence that he is incompetent and maybe more importantly I am satisfied that the evidence I've alluded to . . . indicates quite convincingly that although he may be slow and although he may have limitations that may be characterized as mental deficits, that these do not keep him from being able to understand what takes place at a trial or keep him in any way from being able to assist his counsel.

"Accordingly, I find him competent to stand trial pursuant to Penal Code section 1367 and also under the due process clauses of both the United States and the California Constitutions."

Defendant contends that ruling lacks the support of substantial evidence. "In reviewing a jury verdict that a defendant is mentally competent to stand trial, an appellate court must view the record in the light most favorable to the verdict and uphold the verdict if supported by substantial evidence." (*People v. Marshall*, *supra*, 15 Cal.4th 1, 31.) "In applying the test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the [trier of fact] could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge . . . to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends . . . .' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" the [trier of fact's decision.] [Citation.] [¶] The same standard governs in cases where the prosecution relies primarily on circumstantial evidence. [Citation.]" (*People v. Zamudio*

8

(2008) 43 Cal.4th 327, 357.) "On appeal a finding of competency to stand trial 'cannot be disturbed if there is any substantial and credible evidence in the record to support the finding." (*People v. Hightower* (1996) 41 Cal.App.4th 1108, 1111.)

The court heard the testimony of eight witnesses, including one mental health professional for each side, and considered numerous exhibits. There is no need to summarize the totality of the evidence, because it is readily apparent that there is ample substantial evidence supporting the trial court's determination that defendant was competent to stand trial.

It is certainly true that the defense psychologist, Dr. Patricia Spivey, was firmly of the opinion that defendant was not competent to stand trial. But the prosecution's psychiatrist, Dr. Randall Solomon, was just as adamant that defendant was competent. That should be, and is, the end of the matter, for it is a settled principle that a single witness, if deemed credible by the trier of fact, is substantial evidence. (Evid. Code, § 411; *People v. Cudjo* (1993) 6 Cal.4th 585, 608-609; see *People v. Leonard* (2007) 40 Cal.4th 1370, 1391-1393 [report and testimony of one expert witness constitute substantial evidence].)

Yet defendant argues that "the evidence of incompetency presented by the defense [i.e. Dr Spivey's testimony] was substantial," indeed, "compelling," while "the evidence of competency presented by the prosecution and relied on by the court was insubstantial." But it was defendant who was carrying the burdens of persuasion and proof to rebut the presumption that he was competent. (*People v. Ary* (2011) 51 Cal.4th 510, 517-518; *People v. Marks* (2003) 31 Cal.4th 197, 215.) Whether evidence is compelling is in the eye of the trier of fact, which in this case means we must accept that it was *not* Dr. Spivey. The trial court's detailed comments ("I seriously question," "This explanation is not . . . satisfactory," "my reservations, " "the negative opinion this has on the weight I am prepared to give Dr. Spivey's opinion") leave no room for doubt on this point. Moreover, the court made it clear that the "other evidence" was "very revealing as to whether defendant would be able to understand what goes on at a trial and . . . assist his counsel in providing a defense at such trial."

9

Defendant implicitly treats Dr. Spivey's more recent examination as being inherently more credible than Dr. Solomon's "outdated" evidence, but he provides no authority for such a conclusion. The freshness or staleness of an examination would appear to be merely one factor going only to the weight of the opinion it supports. (See *People v. Valencia* (2008) 43 Cal.4th 268, 295; *People v. Boyer* (2006) 38 Cal.4th 412, 480-481; cf. *People v. Cobb* (2010) 48 Cal.4th 243, 252 ["A defendant's condition a year earlier is relevant but not dispositive" to issue of whether he qualifies as mentally disordered offender]; *People v. Dunkle*, *supra*, 36 Cal.4th 861, 889-890 [jury could consider the timing and amount of time experts spent interviewing defendant].) And the weight to be given to testimony is a matter conclusively entrusted to the trier of fact. (*People v. Lindberg* (2008) 45 Cal.4th 1, 27; see *People v. Guerra* (2006) 37 Cal.4th 1067, 1129.)

Defendant's expert exclusive approach would seem to deny utility to the mass of nonexpert, circumstantial evidence cited by the trial court. (Cf. *People v. Rogers*, *supra*, 39 Cal.4th 826, 847 ["Evidence of incompetency may emanate from several sources, including the defendant's demeanor, irrational behavior, and prior mental evaluations."]; *People v. Ramos* (2004) 34 Cal.4th 494, 507 ["Substantial evidence of incompetence may arise from separate sources"].) The testimony of lay persons might not be as weighty as the opinion of mental health professionals, but it is not to be dismissed as worthless. The testimony of law enforcement personnel and jailers who had personal experience with the defendant would seem to have a particular insight into certain aspects of defendant's ability to deal with, and to interact with, the workings of the legal system. Indeed, the trial court found it "very revealing" on the issues of defendant's competency. Moreover, this precise category of evidence was considered and implicitly treated as relevant by our Supreme Court in *People v. Dunkle*, supra, 36 Cal.4th 861, 888-889. Finally, although it does not appear to be directly involved here, the judicial officer's personal observations of the defendant may be consulted in determinations of competency. (See *People v. Lewis* (2008) 43 Cal.4th 415, 525; *People v. Danielson* (1992) 3 Cal.4th 691, 727.)

"A defendant is deemed competent to stand trial . . . if he ' "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" 'and ' "has a rational as well as factual understanding of the proceedings against him." ' " (*People v. Ary*, *supra*, 51 Cal.4th 510, 517.) Our review of the record, conducted along the lines of the trial court's ruling, establishes that that ruling has the support of ample, if not abundant, substantial evidence. (Evid. Code, § 411; *People v. Zamudio*, *supra*, 43 Cal.4th 327, 357; *People v. Hightower*, *supra*, 41 Cal.App.4th 1108, 1111.)

## The Trial Court Did Not Abuse Its Discretion In Excluding Testimony From Defendant's Mother

The prosecution moved in limine to exclude testimony that "The defendant's mother, when interviewed by police regarding jail phone calls between her and the Defendant, said that although he confessed to murder on the jail phone calls, he frequently tells her things just to make her upset." The prosecution argued that admission of this evidence was precluded by Evidence Code section 1102, arguing as follows: "In the instant case, the defendant is attempting to prove his conduct on a particular occasion (notably not of the crime itself) by introducing evidence of his character or a trait of his character. Evidence Code section 1102, however, does provide the following: 'In a criminal action, evidence of the defendant's character or a trait of his character in the form of an opinion or evidence of his reputation is not inadmissible by Section 1101 if such evidence is : (a) Offered by the defendant to prove his conduct in conformity with such character or trait of character.'

"However, there are logical limitations to what a Defendant can present in terms of character evidence under Section 1102. Notably the first (and most prescient) limitation is the following, as held in *People v. Monteverde* (1965) 236 Cal.App.2d 630, 642: 'Testimony as to an element of character not involved in the crime of which the

11

defendant is on trial is not admissible.'[1]  [Citations.]  Thus, the first inquiry must be made as to what element of character the defendant is seeking to admit with his mother's testimony.  Ostensibly, the Defendant will attempt, through his mother, to demonstrate that he has the character trait of telling her negative things about himself, although false, to gain her attention.

"The second, and determinative, inquiry is whether this trait of character is 'involved in the crime of which' the defendant is on trial.  It most definitely is not.  The defendant is not charged with telling his mother true things.  Nor is the defendant charged with trying (or not trying) to get his mother's attention.  Thus, the defendant seeks to admit evidence of a character trait that is not involved in the crime that he is charged with.  Accordingly, evidence of Defendant Molina's character for telling his mother true (or false) things is plainly inadmissible."

---

[1] Notwithstanding the prosecutor's citation of a single authority that is almost 60 years old, the point made by *Monteverde* is very well established.  One of the two decisions cited by the *Monteverde* court was *People v. Chrisman* (1901) 135 Cal. 282, where our Supreme Court held it was not error to preclude a witness from answering the question " 'What were the boy's habits as to steadiness, drinking, or anything of that sort?' " because, with respect to a person on trial for grand larceny, "This question did not touch his character or reputation for honesty, which was the trait involved in the charge made against him."  (*Id*. at p. 288.)  *Chrisman* cited *People v. Ashe* (1872) 44 Cal. 288, where the Supreme Court stated that a criminal defendant "is permitted to support the . . . presumption of innocence by proof of the fact that his personal character in the trait involved in the charge has previously been good."  (*Id*. at p. 291.)

Nothing changed with the adoption of the Evidence Code.  The Law Revision Commission made this comment to Evidence Code section 1102:  "Under Section 1102, the accused in a criminal case may introduce evidence of his good character to show his innocence of the alleged crime—provided that the character or trait of character to be shown is relevant to the charge made against him.  This codifies existing law.  *People v. Chrisman*, 135 Cal. 282 . . . (1901)."  (Cal. Law Rev. Com. com. 29B Pt. 3B, West's Ann. Evid. Code (2009 ed.) foll. § 1102, p. 311; see Wydich, *Character Evidence: A guided Tour of the Grotesque Structure* (1987-1988) 21 U.C. Davis L. Rev. 123, 141-142 ["To be relevant, the defendant's evidence must concern a character trait that is inconsistent with the crime charged."].)

Defendant filed a "response" in which he advised that he "will defer presenting argument as to expected testimony of defendant's mother . . . until the hearing of this issue."

In discussing the in limine motions, the prosecutor argued: "I made a motion with respect to Mr. Molina's mother . . . [her] proposed testimony. [¶] I anticipate—and I don't know because I don't have any statements—I have a statement that she gave to the police, obviously, but I don't know if Mr. Hoehn [defense counsel] has any additional statements from her. If so, I have not received them. [¶] I anticipate she would take the witness stand and say something to the effect of: Yes, I listened—I spoke with Mr. Molina, my son, in jail shortly after he was incarcerated. I asked . . . him if he committed a murder, what he was charged with. [¶] He said murder. [¶] I expressed my dismay. [¶] He replied, oh, well, I did do it. [¶] And you should all know that there is something about my son, which is that he always tells me things he did to get my attention. He is always falsely confessing to me, said that he has committed when he really hasn't done them.

"That is, for my motion, inadmissible character evidence and I don't think it should be allowed. [¶] I also think this not only applies to the defendant's mother, but I think it applies to any and all mental health experts the defense will call. It was discussed extensively in Dr. Carolyn Walser's testimony . . . . I don't think it's reflective of any psychological condition diagnosed in the DSM-IV. And I think again, it's inappropriate and inadmissible character evidence. I understand why the defense wants to introduce it, but I don't think that makes it any more . . . admissible."

Defense counsel responded: ". . . [T]he material referred to by the People is addressed by Dr. Walser as part of her opinions and conclusions . . . [a]nd ultimately in her January 31, 2009 DSM-IV-TR diagnostic impression, her active diagnosis includes major depression, and I believe as part of her prospective testimony regarding Mr. Molina's mental functioning, how his mind works. And she ultimately indicates that he has severe neuropsychological impairment and part of his behavior with his mother is relevant with respect to what he may say.

13

"And so as part of both the mother's testimony which we would be offering basically as her overall good character assessment of her son that he is not a violent person, not a person that would shoot someone, not a killer despite [the] People's evidence through all of the gang members who blame him for the December 22 murders. There isn't any evidence outside of that and alleged statements by him to gang members relative to that case. . . .

"And these reports were prepared a long time ago and the People have had that in their discovery materials for a long time. And Mr. DeFerrari [the prosecutor] is correct, the statement in the police reports is the comment specifically addressing the way my client would get his mother's attention.

"But, the other component, obviously, is the other material that we are offering in this case, specifically what was implanted in his mind by the police regarding probably going to prison for life because they have witnesses, what can he say.

"So it's—there two prongs to our argument why his statements have a different meaning than what the People would say they mean. So again, it's our right to present evidence that we are seeking to preserve my client's constitutional rights to a fair trial, equal protection of the law and his other constitutional rights to present evidence. The People don't have to agree with it, but in order to get it before the jury it's ultimately, most important and it's crucial to the defense to have this component of that interpretation before the jury through those two witnesses, my client's mother and Dr. Carol Walser.

This led to the following exchange between the court and defendant's counsel:

"THE COURT: So you are saying that the mother's ability to say that the defendant is a non-violent person permits her to say that he frequently says things to get my attention that are not true?

"MR. HOEHN: She is the only person that would have that knowledge and the Doctor relied upon that as part of her report.

"THE COURT: Right. The question is whether it's admissible.

"MR. HOEHN: Exactly.

14

"THE COURT:  Well, under 1102 the defendant can present its character reputation or opinion but not through specific acts.  Seems to me that these are this is a specific act.  [¶] So it's not clear to me that his mother is permitted to testify as part of his general opinion or reputation as an honest and law abiding person, that on given occasions he used to do certain things to support that opinion.  Generally, specific acts are not admissible under 1102.  [¶] . . . [¶] . . . I think the analysis is different as to the psychologist or the professionals.  Experts, of course, may rely on hearsay.  The question is what hearsay is admissible through the expert.  And, of course, the jury would be instructed it's not admissible for the truth of the matter asserted.  I have to parse out the degree to which specific hearsay can be elicited in front of the jury under the case law relating to experts."

The prosecutor argued there was also the point "set out in . . . *People v. Monteverde* . . . which is the testimony as to an element of character not involved in the crime of which a defendant is on trial is not admissible.  If the defendant were charged with telling his mother the truth on all occasions then I think I suppose this would be tremendously relevant evidence.  It is not what the defendant is charged with, he is charged with murder.

"Moreover, I don't think that the psychologist gets to back door in the testimony that the defendant always lies to his mother because he wants attention.  Again, that is not any particular part of her diagnosis.  That is not a symptom of depression.  It's nothing to do with this case, . . . it's a convenient piece of her report for the defendant which she entirely relies upon the defendant's mother for.  So it's—I guess the classic scenario of getting in the back door . . . what can't be fit through the front.

"On top of that, it's not relevant to this trial.  If the defendant were to take the stand and say, look I didn't mean what I said, I always say things to get my mom's attention like that.  Perhaps there would be a differed argument.  But . . . I don't think the defendant can introduce those through an expert especially considering they don't bolster her opinion about any of his mental conditions."

15

"THE COURT: . . . [T]he question is whether hearsay is admissible through the expert. For example, his statement that he is innocent of the crimes. I'm not sure that isn't admissible through the experts. [¶] . . . [T]he basis for the expert's opinion is admissible is so the jury can evaluate what weight to give the expert's opinion, but it doesn't serve as a vehicle for admitting hearsay."

The court continued: "The question is whether it's relevant to the only basis for admissibility of her [Dr. Walser's] opinion is whether it helps the jury decide if the defendant actually formed the intent . . . [¶] . . . [¶] . . . [or] the agreement to kill . . . . And I understand the point that he may have intellectual deficits that affect his ability to form that intent or whether he did in fact form that intent, but I'm not sure I see how his testimony to try and get attention from his mother affects his ability or impacts whether he had formed the intent or agreement to kill with his co-conspirators. [¶] In other words, I think the People have a valid point that it doesn't relate to the admissible basis for the psychologist's testimony on that issue. And that is on the actual intent to kill or conspire."

After hearing additional argument, the court then stated: "The cases on experts generally require that the Court perform a gatekeeping function and make sure that hearsay isn't brought in wholesale, unreliable hearsay isn't brought in wholesale through an expert so that the jury takes it for the truth of the matter asserted. That is one of the functions I have to perform. [¶] . . . [¶] . . . I'll get you rulings before opening statements."

The court's eventual ruling was as follows: "On the issues of the defendant's jail calls and his intent at the time of the jail calls, it's my present conclusion that the proposed testimony from the defendant's mother that it was the defendant's habit or custom or character to falsely claim things were worse than they really were in order to get her attention is character evidence inadmissible under Evidence Code Sections 1101 and 1102 because they are specific instances of conduct offered to prove that the defendant acted in conformity there with the jail calls.

16

"There with similarly as to the proposed testimony from the mental health experts, but based on the mother's statements to them and the defendant's statements to them it is the experts' conclusion that the defendant had the tendency to seek attention from his mother by overly describing things as worse than they really were is not a mental condition that is relevant to the defendant's intent at the time of forming a conspiracy or committing the alleged crimes, it is at best an opinion as to what the defendant was thinking when he made certain admissions to his mother on the telephone.

"And in my view that is expressly prohibited by . . . Penal Code sections 25, 28 and 29.

"Penal Code section 28 says that evidence of a mental disease, mental defect or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated or harbored malice aforethought when a specific intent crime is charged. The defendant's tendency to make things look worse when he spoke to his mother to get her attention is not relevant to the defendant's actually forming the required specific intent for the charged crimes.

"So my view it is excluded by sections 25, 28 and 29 of the Penal Code."

The standard of review for evidentiary rulings on relevance and character evidence is abuse of discretion. (*People v. Fuiava* (2012) 53 Cal.4th 622, 667-668 [relevance]; *People v. Doolin* (2009) 45 Cal.4th 390, 437 [Evid. Code, § 1102].) "A trial court abuses its discretion when its ruling ' " fall[s] 'outside the bounds of reason.' " ' [Citation.]" (*People v. Benavides* (2005) 35 Cal.4th 69, 88.) The same stringent standard applies to excluding evidence pursuant to the Penal Code sections cited by the trial court. (*People v. San Nicolas* (2004) 34 Cal.4th 614, 661-663; *People  v. Cortes* (2011) 192 Cal.App.4th 873, 909, 912.)

However, defendant attacks the exclusionary ruling only insofar as it was based on Evidence Code section 1102. In other words, defendant does not challenge the other grounds for the ruling.

The most elemental principle of appellate review is that trial court error is never presumed, but must be demonstrated by the appellant. (E.g., *People v. Giordano* (2007)

17

42 Cal.4th 644, 666.) Almost as fundamental is the principle that " ' "a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for the wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion." ' " (*People v. Brown* (2004) 33 Cal.4th 892, 901.) Thus, the other grounds given by the court, which do not evoke challenge by defendant, are deemed sufficient for the ruling. (See *Western States Petroleum Assn. v. Board of Equalization* (2013) 57 Cal.4th 401, 409; 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 355, pp. 409-410.)

Defendant attempts to give his argument a constitutional dimension by asserting the ruling infringed "his constitutional due process right to present a complete defense . . . and his constitutional right to compulsory process." This attempt to elevate the status of the claimed error will not prevail.

" 'As a general matter, the "[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense." [Citations.] Although completely excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense. [Citation.] If the trial court misstepped, "[t]he trial court's ruling was an error of law merely; there was no refusal to allow [defendant] to present a defense, but only a rejection of some evidence concerning the defense." [Citation.]" (*People v. Boyette* (2002) 29 Cal.4th 381, 427-428.)

The ruling did not impair defendant's right to present a defense. Defendant himself could testify to his fantasist tendencies in conversing with his mother. (*People v. Gerule* (2002) 28 Cal.4th 557, 605 ["Defendant was free to present this information by taking the stand himself."].) That, together with counsel's closing argument, could serve to acquaint the jury with the defense theory that defendant did not commit the charged offense. (See *People v. Whisenhunt* (2008) 44 Cal.4th 174, 213 ["Through defendant's testimony and defense counsel's closing argument, the jury was fully apprised of the defense theories"].) Thus, "the trial court merely rejected some evidence concerning a

defense, and did not preclude defendant from presenting a defense." (*People v. McNeal* (2009) 46 Cal.4th 1183, 1203.) The excluded evidence was "defense evidence on a minor or subsidiary point." (*People v. Boyette, supra,* at p. 428.) Yes, it can be seen as involving defendant's credibility, but only in the sense of collaterally impeaching a single statement. Excluding one source of that impeachment did not undermine the prosecution's case against defendant.

Lastly the "right to present a complete defense" principle invoked by defendant appears limited to capital cases. (See *People v. Homick* (2012) 55 Cal.4th 816, 855; *People v. Rogers*, *supra*, 39 Cal.4th 826, 872 & fn. 18.) That is not implicated here.

In light of the foregoing, defendant has not established that granting the prosecution's in limine motion amounted to a clear abuse of discretion. (*People v. Fuiava*, *supra*, 53 Cal.4th 622, 667-668; *People v. Benavides*, *supra*, 35 Cal.4th 69, 88.)

### The Challenged Murder Convictions Will Be Allowed To Stand

Under this caption in his brief, "two of appellant's four convictions of murder must be reversed because the evidence fails to show that appellant perpetrated, aided and abetted, or conspired to commit them," defendant argues: "Appellant was tried and convicted of murder in counts one, seven, eight, and nine. The prosecution presented evidence to show that appellant fired the shots that killed Antonio Cintron in count one and evidence to show that appellant drove the getaway car from the shooting that killed Luis Perez in count seven. However, the prosecution presented no evidence to show that appellant had any responsibility for the shooting deaths of Lisa Thayer in count eight or Rico McIntosh in count nine."

It is significant that defendant does not challenge his conviction for conspiracy (count four), because it is that peculiar creature, the law of conspiracy, which defeats defendant's attempt to overturn the two murder convictions. Defendant, on the other hand, has only naked logic on this side. After all, he maintains: "I was in the county jail, I did not provide the gun(s) or any other instrumentality used in the murders, and I gave no direct orders for the murders."

19

The law on this issue may continue to be controversial, but it is settled.

"Since conspiracy is a continuing offense [citation], a defendant who has joined a conspiracy continues to violate the law 'through every moment of [the conspiracy's] existence,' [citation], and he becomes responsible for the acts of his co-conspirators in pursuit of their common plot." (*Smith v. United States* (2013) 568 U.S. __, __ [133 S.Ct. 714, 719].)  This court made the same point three decades ago:  "Once the conspiracy is established it is not necessary to prove that each conspirator personally participated in each . . . [act of the conspiracy] . . . since members of the conspiracy are bound by all acts of all members committed in furtherance of the conspiracy." (*People v. Cooks* (1983) 141 Cal.App.3d 224, 312; see *People v. Kauffman* (1907) 152 Cal. 331, 334 [" 'In contemplation of law the act of one is the act of all.  Each is responsible for everything done by his confederates' "].)

We continued:  "The crime of conspiracy can be committed whether the conspirators fully comprehended its scope, whether they acted together or in separate groups, or whether they used the same or different means known or unknown to them." (*People v. Cooks*, *supra*, 141 Cal.App.3d 224, 312.)  One of the authorities cited for this principle was our decision in *People v. Means* (1960) 179 Cal.App.2d 72, 80, where we stated:  "[T]here need be no showing of direct association between members of a conspiracy.  Common design is the essence of a conspiracy and the crime can be committed whether the parties comprehend its entire scope, or whether they act in separate groups or together, by the same or different means known or unknown to them, if their actions are consistently leading to the same unlawful result . . . ."

And, strikingly applicable here, we further stated in 1983:  "Once the defendant's participation in the conspiracy is shown, it will be presumed to continue unless he is able to prove, as a matter of defense, that he effectively withdrew from the conspiracy. [Citation.]  [¶] Although a defendant's arrest and incarceration may terminate his participation in an alleged conspiracy, his arrest does not terminate, or constitute a withdrawal from the conspiracy as a matter of law.  [Citations.]  Withdrawal from, or

termination of, a conspiracy is a question of fact." (*People v. Cooks*, *supra*, 141 Cal.App.3d 224, 316.)

" 'Each member of the conspiracy is liable for the acts of any of the others in carrying out the *common* purpose, i.e., all acts within the reasonable and probable consequences of the common unlawful design.' " (*People v. Flores* (2005) 129 Cal.App.4th 174, 182, quoting what is now 1 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Elements, § 98, p. 404.) And, in the classic formulation by our Supreme Court: "whether or not the act committed was the ordinary and probable effect of the common design or whether it was a fresh and independent product of the mind of one of the conspirators, outside of, or foreign to, the common design, is a question of fact for the jury [citations], and if there be any evidence to support the finding of the jury on this question, its determination is conclusive." (*People v. Kauffman*, *supra*, 152 Cal. 331, 335.) This is part of the jury's power "considering the unique circumstances and the nature and purpose of the conspiracy of each case—to determine precisely when the conspiracy has ended." (*People v. Saling* (1972) 7 Cal.3d 844, 852.)

From these authorities it should be clear that defendant's incarceration and lack of direct communication to the killers of Thayer and McIntosh is not legally dispositive. Neither his actual presence nor his direct participation was required for liability. Defendant does not dispute his membership in a criminal street gang. He does not dispute the existence of the conspiracy, or that he was properly convicted of that substantive offense. He does not contend he ever withdrew from that conspiracy. He is thus liable for the Thayer and McIntosh murders committed after his incarceration, if they can be deemed the "ordinary and probable effect[s]" (*People v. Kauffman*, *supra*, 152 Cal. 331, 335), the " 'reasonable and probable consequences' " (*People v. Flores*, *supra*, 129 Cal.App.4th 174, 182) of the conspiracy.

This is where defendant makes his stand: he argues that he cannot be convicted of the Thayer and McIntosh killings because, adopting another Supreme Court phrasing, "those two killings were not the natural and probable consequences of any conspiracy [see *People v. Prieto* (2003) 30 Cal.4th 226, 250] entered into by appellant. . . .

21

[N]othing about appellant's expressed intention suggested that appellant and other gang members conspired that they would aggressively hunt for Norteños and anyone who resembled Norteños and kill them at every opportunity for an indefinite period of time into the future. . . . No evidence was presented to show that appellant aided, facilitated, or encouraged either of the killings in counts eight and nine. It would be unreasonable to expand conspiracy theory liability to cover murders committed after a conspirator is in custody when there is no clear link between the conspirator and the killing. Thus the shooting deaths of Thayer and McIntosh could not be the natural and probable consequences of any conspiracy involving appellant." We do not agree.

Insofar as defendant is relying on his status as a prisoner in the county jail, it has been shown that the fact of his incarceration does not terminate his potential criminal liability as a matter of law. In any event, it would be inaccurate to picture defendant as sitting silently in his cell, with no contact with his VFL colleagues. The jury heard evidence of recorded phone conversations that defendant made to the gang's current leader. The leader promised to send money to defendant while he was in jail, and to take care of defendant's mother. The leader also provided information of the latest developments concerning other gang members, and gave defendant messages to pass on to other gang members in the jail. Most crucially, he gave orders to defendant and made it clear defendant was still under gang discipline. The jury also heard testimony from a jail guard that defendant appeared to be associating and socializing with the other Sureños inmates.[2] From this evidence the jury could conclude that defendant never withdrew from the conspiracy but remained an active part of it.

Defendant's emphasis on the lack of a "clear link" between himself in jail and other gang members is also misplaced, for it erroneously assumes that a direct connection and correlation is required. (*People v. Means*, *supra*, 179 Cal.App.2d 72, 80.) It is also

---

[2] Not all of the information heard at the competency hearing about defendant's behavior and activity in jail was reintroduced at his trial. Parenthetically, it may be pertinent to note that the competency determination was made by retired Judge Peter Spinetta, while Judge John W. Kennedy presided at defendant's trial.

contrary to the presumption that defendant remained a member of the conspiracy. (*People v. Cooks*, *supra*, 141 Cal.App.3d 224, 316.)

Defendant's assumption is also at odds with the nature of conspiracies. " '[I]t was not necessary for the State to prove that the parties actually came together, mutually discussed their common design, and after reaching a formal agreement set out upon their previously agreed course of conduct.' " (*Lorenson v. Superior Court* (1950) 35 Cal.2d 49, 57.) "It is seldom possible for the prosecution to offer direct evidence of an agreement to commit a crime. The agreement to commit the crime is usually made in secrecy. The conspiracy must be inferred by the trier of fact from all the circumstances" (*People v. Chavez* (1962) 208 Cal.App.2d 248, 253), which here would include the "common gang membership . . . 'the conduct [of the conspirators] in mutually carrying out a common illegal purpose, the nature of the act, the relationship of the parties [and] the interests of the alleged conspirators . . . .' " (*People v. Superior Court* (*Quinteros*) (1993) 13 Cal.App.4th 12, 20-21.)

The jury heard more than ample evidence that the VFL and ML Sureño gangs had a systematic practice of hunting down and trying to kill rival Norteño gang members and suspected members. The killings were accomplished in the same manner—on the streets, using handguns. Defendant participated in that campaign of killing before he was arrested. Thus, the jury had a basis for treating subsequent Norteño killings as the natural and probable consequences of the conspiracy, and for treating defendant, even after he was incarcerated, as still a member of the on-going conspiracy. (*People v. Zamudio*, *supra*, 43 Cal.4th 327, 357; *People v. Kauffman*, *supra*, 152 Cal. 331, 335; *People v. Flores*, *supra*, 129 Cal.App.4th 174, 182; *People v. Cooks*, *supra*, 141 Cal.App.3d 224, 316.)

## DISPOSITION

The judgment of conviction is affirmed.

_____

Richman, J.

We concur:

_____

Kline, P.J.

_____

Haerle, J.