Filed 4/26/22  P. v. Gonzalez CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

    Plaintiff and Respondent,

v.

MOISES ENRIQUE GONZALEZ,

    Defendant and Appellant.

E077182

(Super.Ct.No. RIF1803043)

OPINION

APPEAL from the Superior Court of Riverside County.  Michael B. Donner and Jacqueline B. Jackson, Judges.[*]  Affirmed.

Jean Ballantine, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Daniel Rogers, Acting Senior Assistant Attorney General, and A. Natasha

---

[*]    Judge Donner presided over the trial.  Judge Jackson denied defendant's motion for new trial.

Cortina and Annie Featherman Fraser, Deputy Attorneys General, for Plaintiff and Respondent.

In downtown Riverside, a man chasing another man fired five shots at the latter but missed. There was an eyewitness to the shooting; it was also captured on surveillance videos.

A jury concluded that defendant Moises Enrique Gonzalez was the shooter. It found him guilty of willful, deliberate, and premeditated attempted murder (Pen. Code, §§ 187, subd. (a), 664, subd. (a)),[1] with an enhancement for personally and intentionally discharging a firearm (§ 12022.53, subd. (c)). He was sentenced to life in prison, with the possibility of parole, plus 20 years, along with the usual fines, fees, and ancillary orders.

Defendant contends:

(1) There was insufficient evidence that the attempted murder was deliberate and premeditated.

(2) The trial court erred by admitting photos found on Instagram, because they were not adequately authenticated.

(3) The trial court erred by allowing a police officer to testify about what the videos showed. As defense counsel did not object to this testimony, defendant also contends that the failure to object constituted ineffective assistance of counsel.

---

[1] All further statutory citations are to the Penal Code, unless otherwise specified.

2

(4)  The prosecutor committed misconduct in closing argument.  As defense counsel did not object to the asserted misconduct, defendant also contends that the failure to object constituted ineffective assistance of counsel.

(5)  The trial court erred by denying defendant's motion for a new trial, which was based on juror misconduct.

We find no error — or, at least, no error that has been preserved for appeal. Hence, we will affirm.

I

STATEMENT OF FACTS

On June 12, 2018, around 12:15 p.m., a man in a white tank top started following a man in a black tank top down University Avenue in Riverside.  The man in white put his right hand in his backpack and ran a short distance, until they were maybe 50 to 100 feet apart.  For about 40 seconds, they kept walking forward as they exchanged words and gestures; meanwhile, the man in white's hand was still in his backpack.

Then the man in white, his hand still in his backpack, started running again.  He caught up with the man in black in the parking lot of Bobby Bonds Park.  The man in black jinked to the left and started running through the parking lot.  The man in white ran after him, pulled a gun out of his backpack, and fired five shots.  He then broke off the chase and ran away.

The man in black was never located or even identified with any certainty.

E.J.,[2] a park maintenance worker, saw the chase and heard the shots. The shooter ran past him, within 10 to 20 feet. He saw the shooter for 10 to 15 seconds. However, he looked "less [at] the person" and "more at the weapon." He left the park before the police arrived.

In the parking lot, the police found five bullet casings. They did not find any bullet strikes or bullet holes.

On June 26, Detective Joshua Ontko interviewed E.J. E.J. said he thought he would recognize the shooter if he saw him again.

On June 26 and 27, Detective Ontko obtained surveillance videos from four different cameras that captured portions of the chase. On viewing them, he later testified, "I knew I'd seen [the shooter] before." At first, he could not remember the shooter's name; however, when another officer who also watched the videos said it was defendant, he realized that was correct. He reviewed photos of defendant on Instagram and noticed that, in some of them, he was wearing the same clothing as the shooter, including a distinctive hat and belt.

---

[2] This witness is referred to throughout the record by these initials, although his real name was used at trial. We question whether this was authorized. It is permitted in a sex offense prosecution, provided the trial court so orders. (§ 293.5.) However, this is not a sex offense prosecution, and we have found no trial court order. It does not appear that the witness would be embarrassed or endangered if his name was publicly disclosed. At a minimum, there is a tension between the public interest in judicial proceedings (see generally *NBC Subsidiary* (*KNBC-TV), Inc. v. Superior Court* (1999) 20 Cal.4th 1178) and the witness's interest in privacy, which the trial court should have been called upon to resolve in the first instance.

Accordingly, also on June 27, Detective Ontko prepared a "six-pack" photo lineup that included a photo of defendant and showed it to E.J. E.J. picked defendant's photo. He said defendant "definitely looked like" the shooter, but he "was not 100 percent sure." He added that there were "some similarities" but his hairstyle was different.

At trial, E.J. testified that he "felt pretty confident" about his photo identification; he rated his certainty at seven out of ten. However, when defense counsel pointed to defendant in court and asked if he was the shooter, E.J. answered, "I can't tell."

Several days before trial, E.J. viewed the videos for the first time. He realized that his memory of the incident was different in several respects from what they showed. Specifically, he remembered the shooter being on a bicycle; the videos showed that he was on foot. He thought the shooter was wearing black shorts; actually, he was wearing black jeans. He thought the shooter had "poofy hair"; the videos showed that he was wearing a hat. He thought the victim was wearing a plaid or checkered flannel shirt, but he was actually wearing a dark monotone t-shirt.[3]

Selections from the surveillance videos were played for the jury.

As far as Detective Ontko knew, no fingerprints were taken from the bullet casings.

A baseball cap was found along the victim's path of travel. Detective Ontko did not have it tested for DNA because he was not allowed to order a DNA test without a reference sample from a suspect.

---

[3] E.J. also recalled the six-pack lineup as having nine photos.

Detective Ontko recorded both of his interviews with E.J. However, for unknown reasons, all of his recordings from 2017 and 2018 had gone missing.

## II

## THE SUFFICIENCY OF THE EVIDENCE OF

## DELIBERATION AND PREMEDITATION

Defendant contends that there was insufficient evidence that the attempted murder was deliberate and premeditated. (See § 664, subd. (a).)

"When considering such a challenge, '"we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."' [Citation.] We consider '"whether . . . *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."' [Citation.] '[A] reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."' [Citation.]" (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 780.)

"'A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance. [Citations.] "The process of premeditation and deliberation does not require any extended period of time. 'The true test is not the duration of time as much as it is the

6

extent of the reflection.  Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .'"'  [Citation.]"  (*People v. Cage* (2015) 62 Cal.4th 256, 275-276.)

"In *People v. Anderson* [(1968) 70 Cal.2d 15] (*Anderson*), [the Supreme Court] identified 'three basic categories' of evidence [it] has generally found sufficient to sustain a finding of premeditation and deliberation:  (1) planning activity, or 'facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing'; (2) motive, or 'facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a "motive" to kill the victim'; and (3) *manner* of killing, or 'facts about the nature of the killing from which the jury could infer that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" to take his victim's life in a particular way for a "reason" . . . .'  [Citation.]"  (*People v. Morales* (2020) 10 Cal.5th 76, 88-89.)

The *Anderson* factors also apply to whether an attempted murder was deliberate and premeditated.  (E.g., *People v. Lenart* (2004) 32 Cal.4th 1107, 1127-1128.)

"In the years since *Anderson*, '"[the Supreme Court] ha[s] emphasized that its guidelines are descriptive and neither normative nor exhaustive, and that reviewing courts need not accord them any particular weight."'  [Citation.]"  (*People v. Morales*, *supra*, 10 Cal.5th at p. 89.)  "And in fact, . . . the Supreme Court has described the various

7

*Anderson* categories in the disjunctive, inserting an 'or' in the series, as if to emphasize that a first degree murder conviction may be upheld with evidence from any of the three categories . . . ." (*People v. Nazeri* (2010) 187 Cal.App.4th 1101, 1113.)

"'[T]he *Anderson* factors are simply an 'aid [for] reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse.' [Citations.]" (*People v. Brooks* (2017) 3 Cal.5th 1, 59.)

The People concede that there was no evidence of motive. Evidently, however, there was *some* motive, preexisting the encounter, even though we can't know what it was. (See *People v. Halvorsen* (2007) 42 Cal.4th 379, 421 ["Defendant's purposive actions in driving to seek out various persons and then killing them . . . indicate defendant had some motive for his killings — a method to his madness — and that is enough."].) In other words, this is *not* a case in which the victim did something in the moment that for the first time gave the defendant a motive to kill the victim.

As evidence of planning activity, the People argue that defendant "brought a loaded gun to the public place, in the middle of the day, to use in the shooting . . . ." Regardless of whether this was sufficient standing alone, defendant's act of arming himself with a loaded weapon was at least some evidence of premeditation, even assuming he did not expect to encounter the victim. (*People v. Cardenas* (2020) 53 Cal.App.5th 102, 122; see also *id.* at pp. 131-132 [conc. and dis. opn. of Ramirez, P.J.].)

Significantly, there was additional evidence of planning activity. The videos show a moment when defendant starts running; at the same time, he swings his backpack around to his side and reaches inside it with his right hand. As he falls in behind the victim and slows to a walk, he keeps his hand in the backpack. When he starts running again and catches up with the victim, his hand is still in the backpack. Finally, he pulls the gun out of the backpack and starts shooting. In short, he kept his hand on the gun the whole time.

It is reasonably inferable that, as soon as defendant saw the victim, he at least considered shooting him. He continued to contemplate shooting the victim for approximately a minute, while walking behind him for more than a full city block. Sometime during that time, he decided to shoot the victim. He then closed the distance between them — inferably to get a better aim — before actually shooting. "'[P]lanning activity occurring over a short period of time is sufficient to find premeditation.' [Citation.]" (*People v. Pettigrew* (2021) 62 Cal.App.5th 477, 493.) A minute is more than enough time to show reflection and weighing of considerations rather than mere unconsidered or rash impulse. (See *People v. Brito* (1991) 232 Cal.App.3d 316, 324.)

Defendant points out that the location was not favorable to a killing — or, at least, not favorable to getting away with a killing. Bobby Bonds Park is a well-frequented area; E.J. was at the scene, and the videos show occasional passersby. There were also multiple security cameras. All of this suggests that this was a crime of opportunity — that defendant did not expect to encounter the victim, though he seized the moment when

he did.  However, that is not necessarily inconsistent with premeditation.  A plan is a plan, even if it is arrived at hastily and under less than ideal circumstances.

We therefore conclude that there was sufficient evidence that the attempted murder was premeditated and deliberate.

III

THE ADMISSION OF THE INSTAGRAM PHOTOS

Defendant contends that the trial court erred by admitting the Instagram photos because they were not adequately authenticated.

A.    *Additional Factual and Procedural Background*.

Detective Ontko testified, "I found a social media site on Instagram containing Mr. Gonzalez."  He added, "I noticed in several of the pictures he was wearing the same clothing as was depicted in the surveillance cameras just before the shooting."  He identified Exhibits 54 and 55 as photos he had found on the Instagram account.

He then testified that the hat the person was wearing in Exhibit 54 "was the same hat that was worn in the surveillance video just before the shooting."  Defense counsel objected, "Lack of foundation . . . ."  The trial court overruled the objection.

Next, he testified that the belt the person was wearing in Exhibit 55 "is the same belt that the subject, Mr. Gonzalez, was wearing in the video."  Again, defense counsel objected, "Lack of foundation."  Again, the trial court overruled the objection.

Finally, he was asked whether the belt the shooter was wearing in a still photo taken from one of the surveillance videos was the same as the one the person was

10

wearing in Exhibit 55.  Defense counsel objected, "Lack of foundation . . . ."  The trial court overruled the objection.

When the prosecution offered Exhibits 54 and 55 into evidence, defense counsel objected, "[L]ack of foundation."  The trial court overruled the objection.

B.    *Discussion*.

Defense counsel's objections based on lack of foundation failed to preserve defendant's present claim of lack of authentication.  "[A]n objection . . . must be so phrased as to reasonably make clear to the court the specific ground of the objection or motion.  [Citation.]"  (1 Jefferson, Cal. Evidence Benchbook (3d ed. 2003) § 20.2.)  "[W]here the objection is lack of proper foundation, counsel must point out specifically in what respect the foundation is deficient.  [Citations.]"  (*People v. Moore* (1970) 13 Cal.App.3d 424, 434, fn. 8; accord, *People v. Modell* (1956) 143 Cal.App.2d 724, 729-730.)

IV

TESTIMONY ABOUT WHAT THE VIDEOS SHOWED

Defendant contends that the trial court erred by allowing Detective Ontko to testify about what the videos showed.  As defense counsel did not object to this testimony, defendant also contends that the failure to object constituted ineffective assistance of counsel.

11

A.      *Additional Factual and Procedural Background.*

When the surveillance videos were played for the jury, Detective Ontko described or explained what they showed.  He testified that when he viewed them on a computer, the surveillance videos were "clearer" and "[m]ore detail[ed]" than when the jury viewed them projected on a screen.

Some of this testimony was about the physical layout of the area.  For example, he testified:  "[S]o this is Douglas [Street] right there. . . .  So right now this camera is looking towards the parking lot[,] capturing the sidewalk along University."

However, some of this testimony was about the people shown in the videos.  For example, he testified that "the individual with the white tank top walking in the parking lot" was "involved in the incident" — "[t]hat's the subject that's later captured firing a handgun."  He explained that he was able to identify defendant as the shooter because "[at] one point the subject . . . later shown firing the handgun walks just underneath one of the camera views, and we get a nice, clear shot of his face and clothing."  He described defendant as "walking in between the cars and the main entrance" of a medical clinic and then "running."  He also described an "individual" (i.e., the victim) who had "crossed the street from the Laundromat" and was then "walking up University[.]"

Finally, Detective Ontko identified three exhibits as still photos taken from the videos.  He testified that one showed defendant and the other two showed both defendant and the victim.

12

B.    *Discussion.*

As already mentioned, defense counsel did not object to any of this testimony. Thus, he forfeited any contention that the trial court erred by admitting it.  (Evid. Code, § 353, subd. (a).)  We approach this contention exclusively as a matter of ineffective assistance of counsel.

"To make out a claim that counsel rendered constitutionally ineffective assistance, 'the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms.  Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.'  [Citation.]  To make out an ineffective assistance claim on the basis of the trial record, the defendant must show '(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.  All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding.'  [Citation.]"  (*People v. Hoyt* (2020) 8 Cal.5th 892, 958.)

"'[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance.'  [Citation.]"  (*People v. Romero and Self* (2015) 62 Cal.4th 1, 25.)

Defendant argues that Detective Ontko's testimony about the videos was objectionable on three grounds.

13

First, he argues that it violated the secondary evidence rule. (See Evid. Code, § 1521, subds. (b), (d).) Subject to exceptions not applicable here, "oral testimony is not admissible to prove the content of a writing." (Evid. Code, § 1523, subd. (a).)

In *People v. Gonzalez* (2021) 12 Cal.5th 367, the Supreme Court rejected a similar argument. There, police officers testified about videos of the defendant's conversations. "The testimony was intended to provide context about how the conversations arose, clarify what was being discussed, and explain the meaning of certain slang terms." (*Id*. at p. 410.) The Supreme Court held that this did not violate the secondary evidence rule, for two reasons: "First, it is undisputed that the jury was shown the writings in question (in this case videos), and Gonzalez has cited no case in which the secondary evidence rule was applied when the writing itself was admitted into evidence. [Citations.] Second, . . . the purpose of the detectives' testimony was not to prove the actual words that were said in the video, but rather to give general context as to the subject matter of the conversations that were depicted in the recording and explain the meaning of some of the terms the speakers used. [Citation.]" (*Ibid*.; see also *People v. Son* (2020) 56 Cal.App.5th 689, 696 [witness could properly testify to content of video "to highlight important details in the video — details that might otherwise be missed."].)

Here, too, the videos themselves were admitted into evidence. And here, too, the purpose of Detective Ontko's testimony was to provide context for the videos. Thus, based on his familiarity with the location, he explained the physical layout of the area shown. Likewise, based on his viewing and analysis of the videos, he pointed out that the

14

person in a white tank top and black jeans in one video was the same as the person in a white tank top and black jeans in another. Because the videos were from four different cameras, this would help the jurors to mentally stitch them together into a single sequence.

Second, defendant argues that, when Detective Ontko testified that defendant was the shooter, he expressed an impermissible opinion on guilt.

"A witness may not express an opinion on a defendant's guilt. [Citations.] The reason for this rule is not because guilt is the ultimate issue of fact for the jury, as opinion testimony often goes to the ultimate issue. [Citations.] 'Rather, opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact. To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt.' [Citation.]" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 77.)

Detective Ontko did not opine that defendant was guilty. Rather, he opined that defendant was the person seen in the video, arm extended, firing a gun. There is a difference. He could not and did not testify that defendant had the intent to kill, or that there were bullets in the gun, or that defendant did not act in self-defense. Defendant's argument, taken to its logical conclusion, would mean that *no* witness could *ever* identify a perpetrator. Obviously, this is not the law. *People v. Leon* (2015) 61 Cal.4th 569 (*Leon*) held that a police officer who was familiar with the defendant's appearance could testify that he was the person shown in a surveillance video. (*Id.* at pp. 600-601.)

15

"'[T]he identity of a person is a proper subject of nonexpert opinion . . . .' [Citations.] [¶] Court of Appeal decisions have long upheld admission of testimony identifying defendants in surveillance footage or photographs." (*Id*. at p. 601.) "Because [the officer]'s testimony was based on his relevant personal knowledge and aided the jury, the court did not abuse its discretion by admitting it." (*Ibid*.)[4]

Defendant asserts that Detective Ontko had no prior personal knowledge of his appearance. That is not at all clear from the record. Detective Ontko testified that he was "familiar" with defendant "[t]hrough the course[] of my duty as a detective." He had not "been involved in investigations that led [him] to have contact with" defendant. However, he "knew of" defendant.

The fact that he did not contact defendant *during an investigation* does not mean he did not contact him *at all*. For example, he may have contacted defendant in the field and filled out field identification cards on him. (See generally *People v. Sanchez* (2016) 63 Cal.4th 665, 672.) Because defense counsel never objected, the prosecution never had to clarify the basis of Detective Ontko's familiarity with defendant. (If it did involve field identification cards, defense counsel probably preferred that it be left vague.)[5]

---

[4]  The court also noted that "because the surveillance video was played for the jury, jurors could make up their own minds about whether the person shown was defendant." (*Leon*, *supra*, 61 Cal.4th at p. 601.) Of course, the same is true here.

[5]  At the preliminary hearing, Detective Ontko testified that he had had one "prior contact" with defendant.

16

Third, defendant argues that "the testimony was outside [Detective] Ontko's area of expertise. (Evid. Code, § 801.)" As stated in *Leon*, however, ordinary identification testimony is a proper subject of nonexpert opinion testimony. Here, it was of particular assistance to the jury, because the videos were not clear when projected.

In sum, because Detective Ontko's testimony about the videos was admissible, defense counsel did not render ineffective assistance of counsel by failing to object to it.

V

PROSECUTORIAL MISCONDUCT IN CLOSING ARGUMENT

Defendant contends that the prosecutor committed misconduct in closing argument. As defense counsel did not object to the asserted misconduct, defendant also contends that the failure to object constituted ineffective assistance of counsel.

A.      *Forfeiture*.

Defense counsel's failure to object to the asserted misconduct forfeited any contention that it constituted reversible error. "'It is well settled that making a timely and specific objection at trial, and requesting the jury be admonished . . . , is a necessary prerequisite to preserve a claim of prosecutorial misconduct for appeal.' [Citation.]" (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1164.)

Defendant argues that the issue has not been forfeited, for two reasons.

First, he argues that "the issue presents the type of mixed question of law and fact which can be decided by either the trial court or an appellate court." He cites no

17

authority for the proposition that it presents such a question. Supreme Court cases holding the issue forfeited are controlling.

Second, he argues that "the appellate court has discretion to review important constitutional issues that were not raised below." The authority that he cites says merely that "[a] appellate court is generally not prohibited from reaching a question that has not been preserved for review by a party. [Citations.]" (*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6.) It cited, among other things, *People v. Berryman* (1993) 6 Cal.4th 1048, 1072-1076, overruled on other grounds by *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1, and *People v. Ashmus* (1991) 54 Cal.3d 932, 975-976. In both of those cases, however, the court held that a claim of prosecutorial misconduct had been forfeited by failure to object but went on to reject the claim on the merits as an alternative ground. These cases are not authority for *reversing* based on a forfeited prosecutorial misconduct claim. And while the issue is undoubtedly important to defendant, he does not explain how it is so important to society at large as to demand that we make an exception to the usual rule.

We therefore conclude that defense counsel forfeited prosecutorial misconduct as a stand-alone ground for reversal. We will discuss it exclusively under the rubric of ineffective assistance of counsel

B.      *Ineffective Assistance of Counsel.*

1.      *Misstating facts.*

a.      *Additional factual and procedural background.*

In arguing that the attempted murder was willful, deliberate, and premeditated, the prosecutor said: "He hits the streets in the city of Riverside armed with a loaded gun. He's ready to use it, and he does. . . . [¶] . . . The defendant knew what he was doing. This isn't an accidental discharge. This wasn't during an argument while fighting over a gun. This is the defendant basically being a predator and hunting down his target. . . . He chased that victim and waited until he got up close to fire. He didn't choose [*sic*; sc. "shoot"?] from a distance. He didn't shoot in the area. He waited until he was close enough to hit his target."

b.      *Discussion.*

"It is misconduct for a prosecutor to refer to facts not in evidence. [Citation.]" (*People v. Young* (2019) 7 Cal.5th 905, 933.) However, "''[a] prosecutor is given wide latitude to vigorously argue his or her case and to make fair comment upon the evidence, including reasonable inferences or deductions that may be drawn from the evidence.''" [Citation.]" (*People v. Dworak* (2021) 11 Cal.5th 881, 910.)

"When a claim of misconduct is based on remarks to the jury, we consider whether there is a reasonable likelihood the jury construed the remarks in an improper fashion. [Citation.]" (*People v. Steskal* (2021) 11 Cal.5th 332, 350.) "[A]ny allegedly improper statements by the prosecutor must be considered in light of the entire argument.

19

[Citation.] "'In conducting [our] inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.'" [Citation.]" (*People v. Holmes, McClain and Newborn*, *supra*, 12 Cal.5th at p. 789.)

Defendant argues that there was no evidence he was "a predator . . . 'hunting down his target.'" However, he leaves out the prosecutor's explanation — that "[h]e chased that victim and waited until he got up close to fire. . . . He waited until he was close enough to hit his target."

The videos show defendant — sometimes walking, sometimes running — following the victim for more than one city block. However, he does not close with the victim; he stays what appears to be 50 to 100 feet behind him at all times. When the victim enters the Bobby Bonds parking lot, defendant finally speeds up enough to catch up with him. The victim breaks into a run; defendant runs after him, shoots, and then runs away. This could aptly be described as "hunting down his target."

Because the prosecutor did not commit misconduct, defense counsel did not render ineffective assistance by failing to object.

      2.     *Misstating the law*.

      a.     *Additional factual and procedural background*.

Also while discussing premeditation, the prosecutor said: "[B]asically, 'willful' means that the defendant intended to kill when he shot at the unidentified man. That he . . . 'deliberated' means he carefully weighed the considerations for and against his

choices, and knowing the consequences, decided to kill. And, lastly, that he decided to kill before completing the acts of attempted murder. It can be a cold, calculated decision to kill; [it] can be reached quickly. This doesn't mean that the defendant sat around somewhere at home thinking about what he was going to do and planned it out, *it just means that prior to taking the actions that he did, he knew what he was doing*, and he put that in motion. He hits the streets in the city of Riverside armed with a loaded gun." (Italics added.)

b. *Discussion*.

"'[I]t is misconduct for a prosecutor, during argument, to misstate the law [citation], or to invite or encourage the jury to do what the law prohibits.' [Citation.]" (*People v. Rivera* (2019) 7 Cal.5th 306, 337.) Defendant argues that the prosecutor misstated the law by suggesting that premeditation requires nothing more than an intent to kill.

Once again, defendant takes one chunk of the prosecutor's argument out of context — her statement, "it just means that prior to taking the actions that he did, he knew what he was doing." The prosecutor, however, had already correctly defined "deliberate[]" as requiring that "he carefully weighed the considerations for and against his choices, and knowing the consequences, decided to kill." When she said, "it just means . . . he knew what he was doing," she was contrasting that with a nonexistent requirement that he "sat around somewhere at home thinking about what he was going to

21

do and planned it out." No reasonable juror would have understood her to be saying that deliberation — as she had just defined it — was *not* required.

Moreover, she did not argue that defendant "knew what he was doing" when he fired the shots. Rather, he "knew what he was doing" earlier, when "[h]e hit[] the streets in the city of Riverside armed with a loaded gun." Thus, no reasonable juror would have understood her to be saying that a mere intent to kill was sufficient to prove premeditation and deliberation.

Defendant also seizes on the prosecutor's statement shortly afterward: "And it was intentional. He intended to do it. It's not one shot done by accident, it was five." Using an ellipsis, he leaves out the fact that she had changed the subject.[6] She was no longer talking about whether the attempted murder was willful, deliberate, and premeditated; she was talking about the enhancement for personally and intentionally discharging a firearm. (§ 12022.53, subd. (c).)

Specifically, the prosecutor said: "*What about the gun allegation*[*?*] *I need to prove the defendant personally fired a gun. You have the video. There were five shell casings found. We know* [*E.J.*] *said he heard five shots.* And it was intentional. He intended to do it. It's not one shot done by accident, it was five." (Italics added.) In other words, the enhancement required intent. The jury could not possibly have understood this to mean that *premeditation* required only an intent to kill.

---

[6] The ellipsis is not even accurate. It indicates omitted words followed by one paragraph break. Actually, after the paragraph break, there was an entire omitted paragraph and another five omitted sentences.

Again, because the prosecutor did not commit misconduct, defense counsel did not render ineffective assistance by failing to object.

## VI

## JUROR MISCONDUCT

Defendant contends that the trial court erred by denying his motion for a new trial, which was based on juror misconduct.

A.    *Additional Factual and Procedural Background*.

1.    *Testimony that defendant gave a false name*.

On cross-examination, defense counsel asked Detective Ontko whether the police ever used facial recognition software to identify defendant.  He started to answer that, during a traffic stop, defendant had given a false name and date of birth.  Defense counsel objected that this was nonresponsive.  The trial court sustained the objection.  Defense counsel requested an instruction that the jury disregard the answer; the trial court gave the instruction.[7]

On redirect, the prosecutor asked *when* the police used facial recognition software to identify defendant.  Again, Detective Ontko answered that, during a traffic stop, defendant had given a false name and date of birth.  Defense counsel objected, "No foundation."  The trial court sustained the objection.  Defense counsel, however, did not

---

**7**    Although he did not get to complete his answer, presumably Detective Ontko was going to testify that the police used facial recognition software to establish defendant's true identity.  If so, his preamble was actually responsive, because it was necessary background for his intended response.

move to strike. Thus, the trial court did not strike the answer and did not direct the jury to disregard it.

At the end of the trial, the trial court instructed the jury: "During the trial, the attorneys may have objected to questions or moved to strike answers given by the witness. I ruled on the objections according to the law. If I sustained an objection, you must ignore the question. If the witness was not permitted to answer, do not guess what the answer might have been or why I ruled as I did. If I ordered testimony stricken from the record, you must disregard it and must not consider that testimony for any purpose." (CALCRIM No. 104.)

### 2. *Motion for new trial based on juror misconduct.*

The day after the jury verdict, Juror No. 9 contacted defense counsel. She said she was "deeply concern[ed]" about the way the jury had decided the case. At his suggestion, she sent a letter to the trial court. Later, she provided essentially the same letter to defense counsel, this time under oath.

The letter is a chronological account of the deliberations. As it was written by the juror, not counsel, it did not clearly specify what (if anything) assertedly constituted juror misconduct. Many of the things that Juror No. 9 seemed upset about were completely appropriate — e.g., she complained that "I repeatedly heard the foreman say we would need to reach an 'agreement' instead of using the word verdict."

In this appeal, defendant pieces the letter out into four separate instances of misconduct:

24

(1)  "Erroneous legal advice regarding the Instagram photos."

Juror No. 9 testified:  "I asked how did detective On[t]ko verify that the alleged Instagram pictures were in fact pictures of the defendant.  The foreman said that was not a question that needed to be asked because, according to the foreman, 'the pictures were admitted as pictures of the defendant.'  The six jurors who [had earlier voted] 'guilty' chimed in stating it had already been proven the alleged Instagram pictures were in fact pictures of the defendant. . . .  Basically, according to the foreman, it was not for us to try determining whether the individual in the pictures was the defendant or not because the court had already made that determination, otherwise, we would."

(2)  "Receipt of information from extraneous sources/discussion of evidence outside the jury room."

Juror No. 9 testified:  "[Juror] Robert offered to explain to me how Instagram works.  Then the foreman decided to send the group to lunch early so that Robert could explain Instagram to me.  By the elevators, Juror Robert showed me how there is a tag when people post pictures on Instagram.  Robert said that because of confidentiality reasons of the Federal Privacy Act of nineteen-seventy-four, the court would not allow us to see the verification of account/source/tag of the Instagram picture of the alleged suspect.  Robert showed me Instagram examples and how it shows/identifies the person.  Robert added that I could trust the source of the Instagram pictures had been verified by the court."

(3) "Vouching for Detective Ontko's credibility based on matters not in evidence."

Juror No. 9 testified: "I . . . asked how come [Detective] On[t]ko did not present the verification of the [Instagram] pictures . . . . [J]uror Robert [responded] that although too much time had passed, he was going to give [D]etective On[t]ko the benefit of the doubt. Robert also added that not giving detective On[t]ko the benefit of the doubt would be like disrespecting a 'buddy' referring to [D]etective On[t]ko. The foreman agreed with Robert. Robert and the foreman both made statements about their own experience in the military and stated they would not disrespect [D]etective On[t]ko. Robert added yet another remark about his loyalty toward people in law enforcement and the foreman nodded yes. Juror Robert also added that he was going to rely on the years of experience of [D]etective On[t]ko and several other jurors nodded yes."

(4) "Consideration of matters the jury was explicitly instructed to disregard."

Juror No. 9 testified: "I was particularly concerned about several jurors basing their decision . . . on information the Honorable Judge asked us to disregard such as the defendant allegedly changed his name when he was pulled over by police which was repeated several times by several jurors. I insisted they should not be mentioning it. Several jurors, Robert and foreman included, stated that if [D]etective On[t]ko said the defendant changed his name, they believed him even though we were asked by the Honorable Judge to disregard that piece of information."

26

In the motion for new trial, however, defense counsel cited and discussed only one instance of asserted misconduct: "the discussion of defendant's giving the arresting officer a different name . . . ."

In opposition, the prosecution argued only that the entire declaration was inadmissible under Evidence Code section 1150[8] because it "described the deliberation process and verbal reflections of juror's mental processes."

In reply, defense counsel argued that the declaration was admissible under Evidence Code section 1150 because it contained evidence of statements and conduct that were likely to have improperly influenced the verdict.

At the hearing, defense counsel asserted that there were "five instances of juror misconduct"; however, he specified only two: (1) "[t]he . . . fact that the jury totally disregarded the judge's admonition and jury instruction not to discuss nor take into consideration the statement made by defendant to the arresting officers giving a different name," and (2) "[t]he fact that the jury foreman cut deliberations early so he could persuade the dissenting juror during lunch and outside the deli[beration] room . . . ."

At the hearing on the motion, the trial court ruled that the declaration was inadmissible under Evidence Code section 1050. It therefore denied the motion.

---

**8**      Evidence Code section 1150 provides: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." (Evid. Code, § 1150, subd. (a).)

B.     *Discussion.*

1.     *Erroneous legal advice.*

Defendant contends that it was misconduct for the other jurors to assert that the trial court had already made a binding determination that the Instagram photos depicted him.

Defense counsel forfeited this contention by failing to raise it below. (*People v. Lee Chuck* (1889) 78 Cal. 317, 329-330.) In the motion for new trial, he did not assert that this was misconduct. Moreover, at the hearing on the motion, he asserted generally that there were five instances of misconduct, but he did not specify that this was one of them. Thus, the People did not have either notice of or an opportunity to be heard on this issue. (See *People v. Superior Court* (*Kaulick*) (2013) 215 Cal.App.4th 1279, 1296-1298 [People have due process rights].) Moreover, "[a]llowing a court to grant a new trial on a ground not raised by the moving party would be the equivalent of allowing the court to grant a new trial on its own motion, an act which the court is without authority to do. [Citations.]" (*People v. Masotti* (2008) 163 Cal.App.4th 504, 508.)

2.     *Extraneous information and/or discussion outside the jury room.*

Defendant contends that it was misconduct for Juror No. 9 and Juror Robert to discuss how Instagram works.

Once again, defense counsel forfeited this contention by failing to raise it below. (See part VI.B.1, *ante*.) Admittedly, defense counsel did attempt to raise it at the hearing on the motion for new trial. However, we question whether defense counsel's somewhat

28

garbled assertion — which attributed the misconduct to the foreman, rather than to Juror Robert, and which focused on breaking for lunch early, rather than on the discussion during lunch — was sufficient to raise the issue. In any event, the People had already been deprived of the notice and opportunity to be heard to which they were entitled.

3. *"Vouching" for Detective Ontko.*

Defendant contends that it was misconduct for the other jurors to give Detective Ontko "the benefit of the doubt" because he was an experienced law enforcement officer.

Yet again, defense counsel forfeited this contention by failing to raise it below. (See part VI.B.1, *ante*.)

4. *Consideration of excluded evidence.*

Defendant contends that it was misconduct for the jurors to discuss the fact that defendant gave a false name when he was arrested. Defense counsel did preserve this issue by raising it in the motion for new trial. However, it lacks merit.

We may assume, without deciding, that the trial court erred by ruling that Juror No. 9's account of this incident was inadmissible under Evidence Code section 1150. Even if so, that error was harmless, because her account failed to make a prima facie showing of misconduct.

"'A juror who violates his or her oath and the trial court's instructions is guilty of misconduct.' [Citation.]" (*People v. Williams* (2015) 61 Cal.4th 1244, 1262.) Here, however, the jury could consider the fact that defendant gave a false name without violating the trial court's instructions.

29

Admittedly, when Detective Ontko first testified to this fact, the trial court sustained defense counsel's objection and instructed the jury to disregard the answer. However, Detective Ontko testified to this fact again on redirect. That time, the trial court sustained defense counsel's objection, but it did not strike the answer (because defense counsel did not ask it to), and it did not instruct the jury to disregard the answer.

An objection alone — even if sustained — is not sufficient to remove an answer from the jury's consideration. In addition, counsel must make a motion to strike, and the trial court must grant the motion. (*People v. Carmen* (1954) 43 Cal.2d 342, 347; *People v. Letourneau* (1949) 34 Cal.2d 478, 489; *People v. Vetri* (1960) 178 Cal.App.2d 385, 394; *Nungaray v. Pleasant Valley Lima Bean Growers & Warehouse Assn.* (1956) 142 Cal.App.2d 653, 664.)

The trial court's instruction to the jury was consistent with this principle. First, it said, "If I sustained an objection, you must ignore *the question*." (Italics added.) It did not say that the jury had to ignore *the answer*, if one was given. Second, it said, "If I ordered testimony stricken . . . , you must disregard it and must not consider that testimony for any purpose." By negative implication, this meant that, if the trial court *did not* order testimony stricken, the jury was free to consider it. The evidence was plainly relevant as evidence of consciousness of guilt.

Accordingly, the jury was free to consider the evidence that defendant gave a false name when he was arrested, and it did not constitute misconduct by doing so.

## VII

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
                                           P. J.

We concur:

McKINSTER
                   J.

RAPHAEL
                   J.